872 F.2d 1073
 UNITED STATES of America, Appellee,
v.
Antonio RIVERA-SANTIAGO, a/k/a Junior Vivique, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Nestor CANCEL-HERNANDEZ, a/k/a Papo, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Edwin ROMERO-LOPEZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Henry CASTRO-POUPART, a/k/a Quique, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Luis ROMERO-LOPEZ, a/k/a Nando, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Manuel ORTIZ-ORTIZ, Defendant, Appellant.
 Nos. 87-1580, 87-1581, 87-1583, 87-1649, 87-1650 and 87-1582.
 United States Court of Appeals,
First Circuit.
 Nos. 87-1580, 87-1581, 87-1583, 87-1649 and 87-1650 Heard
Dec. 9, 1988.
No. 87-1582 Heard Jan. 13, 1989.
Decided March 30, 1989.
As Amended April 5, 1989.
 
 Ricardo L. Rodriguez Padilla for appellant Antonio Rivera-Santiago.
 Eric M. Cohen with whom Jack R. Blumenfeld and Blumenfeld & Cohen, Coral Gables, Fla., were on brief for appellant Nestor Cancel-Hernandez.
 Rafael F. Castro Lang, San Juan, P.R., by Appointment of the Court, for appellant Edwin Romero-Lopez.
 Seth M. Kalberg, Jr., Boston, Mass., by Appointment of the Court, for appellant Henry Castro-Poupart.
 Francis C. Newton, III, Arlington, Mass., by Appointment of the Court, for appellant Luis Romero-Lopez.
 Miriam Ramos-Grateroles, by Appointment of the Court, for appellant.
 Mervyn Hamburg, Dept. of Justice, Washington, D.C., with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., was on brief for the United States.
 Before BOWNES, BREYER and SELYA, Circuit Judges (Nos. 87-1580, 87-1581, 87-1583, 87-1649 and 87-1650).
 Before BOWNES, BREYER and TORRUELLA, Circuit Judges (No. 87-1582).
 BOWNES, Circuit Judge.
 
 
 1
 The six defendants-appellants were all convicted by a jury under count one of a nine count indictment of being part of a conspiracy with intent to possess and distribute amounts of marihuana,[1] in violation of 21 U.S.C. Secs. 841(a)(1) and 846. The marihuana had been smuggled into Puerto Rico from Colombia on four different occasions. Each of the defendants was also found guilty of one or more of the other eight substantive counts which charged aiding and abetting in the importation of marihuana (counts 2, 4, 6, and 8) and aiding and abetting the possession of marihuana with intent to distribute (counts 3, 5, 7 and 9). Each of the appeals will be discussed separately but before considering the individual cases, an exposition of the genesis, operation and demise of the smuggling venture which was the source of the marihuana supply is necessary as a background.
 
 I. BACKGROUND
 
 2
 The chief witness for the government, Jose E. Panzardi-Alvarez, a/k/a Polo, was the principal planner, organizer and director of the marihuana smuggling venture and the conspiracy to possess and distribute it. He was named in the indictment as an unindicted conspirator. The source of supply for the enterprise was Jacobo Mendez-Compo who resided in Colombia. All of the marihuana brought to Puerto Rico came from Colombia and was sold to Panzardi by Mendez. Mendez was named as a defendant in all nine counts of the indictment. He is not a party to this appeal. Panzardi's chief lieutenant, Cesar Castro-Gomez, was also indicted on all nine counts; he is not a party to this appeal.
 
 
 3
 Panzardi, who had prior experience in drug trafficking, decided in late 1981 to smuggle marihuana into Puerto Rico for distribution and sale. He told Nestor Cancel Hernandez, one of the appellants and an acquaintance of Panzardi, that he needed someone who knew about airplane landing fields in Puerto Rico. Cancel introduced him to Castro and the venture began.
 
 
 4
 The first smuggling operation, however, was by sea, not by air. Panzardi owned a large Chris Craft motorboat, the Survive, which he decided to use for smuggling. He contacted Mendez in Colombia and arranged to rendezvous in January of 1982 with a ship from Colombia carrying a load of marihuana. This operation, however, went awry. The Colombian ship developed engine trouble and the marihuana had to be jettisoned when the Coast Guard arrived to render assistance.
 
 
 5
 Panzardi was not one easily discouraged. He telephoned Mendez and arrangements were made within two weeks of the failed smuggle to send another boatload of marihuana to be transferred to Panzardi's boat. The rendezvous point was off Saba Island, one of the Leeward Islands east of St. Croix. The plan was that the marihuana would be transferred to Panzardi's boat, the Survive, which would take it to Palmas del Mar, a resort development on the east coast of Puerto Rico near the town of Humacao. After two unsuccessful attempts to contact the Colombian ship, rendezvous was made on the third try and the marihuana was off-loaded to the Survive. The marihuana was landed accorded to plan but not without difficulty. The weight of the marihuana caused the Survive to ride low in the water and it took on water, which caused some damage to the marihuana. The Survive was anchored offshore and the marihuana loaded on a small boat for the final transfer to land. After the marihuana had been brought ashore it was loaded on two vans and a truck and taken to a house in Humacao for storage before distribution. The entire shipload weighed between 8,500 and 9,000 pounds.
 
 
 6
 In April 1982, Panzardi, his chief lieutenant, Castro, and Luis Viera Lourido, another indicted defendant not a party to this appeal, and three women friends went for a ride on the Survive to celebrate the success of the smuggle. During the celebration the Survive ran aground on some rocks. The celebrants survived, but the Survive was wrecked beyond repair. Thus ended Panzardi's smuggling by sea. He now turned to the air.
 
 
 7
 Mendez was contacted by Panzardi in the late summer of 1982 and arrangements were made to have a load of marihuana picked up by plane in Colombia and flown to Puerto Rico. Panzardi owned a Piper Aztec, which was to be used for the smuggle. He hired two pilots with previous marihuana smuggling experience, Shaun Baldacchino and Fred McNulty. Both are named in the indictment as being part of the conspiracy. Baldacchino entered into a plea agreement with the government and testified at the trial. McNulty is not involved in this appeal.
 
 
 8
 In the middle of September, Baldacchino and McNulty flew the Piper Aztec to the pick-up site in Colombia. About one thousand pounds of marihuana were picked up and flown to a landing strip at Palmas del Mar. The marihuana was transferred to a van owned by Panzardi and then driven to a house for storage and distribution. The plane was left on the airstrip after the marihuana had been loaded. Panzardi intended to pick it up the next day. Unfortunately for him, United States Custom Officers found the plane and confiscated it. Panzardi was eventually able to regain possession of it, but the plane was no longer used for marihuana smuggling.
 
 
 9
 Panzardi purchased a Twin Beech aircraft in early October. It was flown to St. Thomas and parked there while plans were made for the next smuggle. Mendez was contacted again and arrangements were made to pick up another load of marihuana in Colombia and to fly it to the landing strip at Palmas del Mar. The same pilots were used. This smuggle went smoothly. Fifteen hundred pounds of marihuana were brought to Palmas del Mar, unloaded, stored and then distributed.
 
 
 10
 The final smuggle took place in December of 1982. A load of about eighteen hundred pounds of marihuana was picked up in Colombia and flown to Palmas del Mar in the Beechcraft by the same pilots. This time, however, there was a new development. After the marihuana had been placed aboard a truck and driven away, the police arrived. The plan, as in the prior operation, had been for the pilots accompanied by two women and Panzardi and his mistress, Gloria Nieves Baez, to fly to St. Thomas to allay suspicion and then split up. This time the group went to the police station in Humacao instead of St. Thomas. After questioning, all were released. The marihuana which had been smuggled in on the plane was distributed and sold. Thus, the final smuggle was a success.
 
 
 11
 In addition to Panzardi there were also other participants in the smuggling venture who testified for the government: Francisco Vega Estrado testified in detail about the smuggle by sea. Louis Viera Lourido was also involved in the sea smuggle. Carlos Riollano knew Panzardi as a fellow marihuana distributor. He learned about Panzardi's plan to smuggle marihuana by plane and introduced the pilot, McNulty, to Panzardi. Hector Jesus Padilla Navarez was familiar with some of the participants. As already noted, Shaun Baldacchino was a government witness. The other government witness that had first-hand knowledge of the smuggling operations was Gloria Nieves Baez, Panzardi's paramour.
 
 II. THE APPLICABLE LAW
 
 12
 Before discussing the individual cases, we set forth the legal principles that apply to all the appeals. First, we must review the evidence in the light most favorable to the government, including any legitimate inferences which can be drawn from it to determine whether a rational jury could have found each defendant guilty beyond a reasonable doubt. United States v. Drougas, 748 F.2d 8, 15 (1st Cir.1984); United States v. Izzi, 613 F.2d 1205, 1206 (1st Cir.), cert. denied, Santos v. United States, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980). Second, since all appellants were convicted under count one of being a part of a conspiracy to possess with intent to distribute marihuana, the law applicable to membership in a conspiracy must be discussed. And the law relative to single versus multiple conspiracies requires comment. A short foray into conspiracy law must, therefore, be made.
 
 
 13
 The sine qua non of a conspiracy is the agreement between the conspirators, "and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." United States v. Glenn, 828 F.2d 855, 857 (1st Cir.1987) (quoting United States v. Borelli, 336 F.2d 376, 384 (2d Cir.1964), cert. denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)). In order to prove that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent; intent to agree and intent to commit the substantive offense. United States v. Drougas, 748 F.2d at 15; United States v. Flaherty, 668 F.2d 566, 580 (1st Cir.1981).
 
 
 14
 Because of the secretive nature of the crime, it is recognized that the agreement may be express or tacit. The agreement, whether tacit or express, may be proven by circumstantial as well as express evidence. "[A] common purpose and plan may be inferred from a development and collocation of circumstances." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The actions, as well as the words of the defendants, are evidence of the existence and scope of a conspiracy. United States v. Glenn, 828 F.2d at 857. It is not necessary that the government prove that the defendants knew all of the details of the conspiracy and the participation of others. All that is required is to show "the essential nature of the plan and their connections with it." Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); United States v. Hinds, 856 F.2d 438, 443 (1st Cir.1988). We have held that an individual could be found to be part of a conspiracy to possess and distribute cocaine even though he neither directly participated in interstate trafficking nor knew the precise extent of the enterprise. The fact that he participated in one retail link of the distribution chain, knowing that it extended beyond his individual role, was sufficient. United States v. Moosey, 735 F.2d 633, 635-36 (1st Cir.1984). We have also analogized a conspiracy to a moving train: "[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight--or conduct--regardless of whether he is aware of just what it is composed." United States v. Baines, 812 F.2d 41, 42 (1st Cir.1987).
 
 
 15
 The question of whether there is a single or multiple conspiracy is one of fact for the jury. United States v. Drougas, 748 F.2d at 17. Factors to be considered by the jury are, "the nature of the illegal activity, the method of operation, and the scope of conspirator involvement." Id. That every defendant did not participate in every transaction "does not transform a continuing plan into multiple conspiracies." Id.; United States v. Arruda, 715 F.2d 671, 678 (1st Cir.1983); United States v. Elam, 678 F.2d 1234, 1247 (5th Cir.1982). A single conspiracy is proved if the evidence sufficiently shows "that all of the alleged conspirators directed their efforts towards the accomplishment of a common goal or overall plan...." United States v. Drougas, 748 F.2d at 17. In United States v. Giry, 818 F.2d 120, 127, cert. denied, --- U.S. ----, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987), we noted that a scheme to manufacture and distribute a large quantity of illicit drugs "involved a great many discrete steps and includes a large number of people, most of whom know few of the other participants in the scheme" and thus could be described "as the sum of many discrete conspiracies." We nevertheless held, in accord with the great majority of federal courts, that the entire scheme could be "characterized as a single conspiracy and treating each discrete step as one of the links in an indivisible chain." Id. It is now generally accepted that when a number of people combine efforts to manufacture, distribute and retail narcotics, there is a single conspiracy, a "chain conspiracy," despite the fact that some of the individuals linking the conspiracy together have not been in direct contact with others in the chain. Id. at 127 (collecting cases). The same principles apply to a conspiracy to possess and distribute marihuana.
 
 
 16
 There is no question in this case of the sufficiency of the evidence to prove a single conspiracy to possess and distribute marihuana in Puerto Rico during the time alleged in the indictment, the end of 1981 through the first months of 1983. Panzardi's testimony, which was corroborated by other members of the conspiracy, provided proof beyond a reasonable doubt of the existence of such a conspiracy. The only question is the extent and nature of the involvement of the defendants-appellants. As we review the evidence in the individual cases, it is important to keep in mind that count one charges a conspiracy to possess and distribute marihuana, not a conspiracy to smuggle marihuana into Puerto Rico. The indictment states in pertinent part:
 
 
 17
 Beginning on or about the end of 1981, continuing through and until the first few months of 1983 at [various places] ... the defendants herein [names] ... did unlawfully, intentionally, wilfully, and knowingly, conspire, combine, confederate and agree together and with each other to possess with intent to distribute amounts of marijuana, .... [Emphasis added].
 
 III. THE INDIVIDUAL CASES
 
 18
 A. NO. 87-1580, ANTONIO RIVERA-SANTIAGO A/K/A JUNIOR VIVIQUE
 
 
 19
 Rivera was convicted on the conspiracy count and on count three, that he and others in April of 1982, aiding and abetting each other, did intentionally possess with intent to distribute in excess of one thousand pounds of marihuana.[2] His contention on appeal is that the evidence was insufficient to sustain his conviction.
 
 
 20
 Our review of the record shows the following evidence of Rivera's participation in the conspiracy. Panzardi testified that he drove a truckload of marihuana from the sea smuggle to the house of "Vivique." He identified the defendant Rivera as being Vivique. Panzardi then testified that he did not remember any conversation with Rivera but stated: "there must have been some because I wasn't going to arrive there with a truck full of marihuana without prior notice." Panzardi further testified that prior to storing the marihuana at the house, Rivera had lived there with his wife and mother. Panzardi stated that when he looked over the house prior to using it to store the marihuana he felt that it was "too out in the open to be secure." He therefore told Rivera, who did soldering and grill work, to put a grill on the house.
 
 
 21
 In response to questions from the court, Panzardi testified that he personally made an arrangement with defendant Rivera that marihuana would be stored in a house which was to be obtained by Rivera. Panzardi and Rivera together looked over a house of a friend of Rivera's, "El Maestro," but it was not satisfactory. It was therefore decided that the house in which Rivera lived would be used for marihuana storage and that Rivera would rent another house for himself, his wife and mother.
 
 
 22
 Panzardi moved into the house as soon as the marihuana was unloaded and presumably stayed there until it was distributed. On redirect examination Panzardi testified that he spoke to Rivera about using Rivera's house for storage of marihuana and that Rivera had agreed to do so. Panzardi's testimony was corroborated by Gloria Nieves Baez. She testified that she was present when Panzardi and Rivera discussed the need of a house as a marihuana storage facility. Nieves further testified that Rivera agreed to put bars on his house if Panzardi would bear the cost.
 
 
 23
 Based on the evidence, the jury could have found that defendant Rivera agreed with Panzardi to provide Panzardi with a house for storing marihuana and that a truckload of marihuana was stored in Rivera's house. The inference that Rivera was part of a conspiracy to possess and distribute marihuana within the time frame of count one follows inexorably. A truckload of marihuana is obviously not for personal use. Rivera knew that his house was to be used as a storage depot until distribution could be arranged. Although there was no evidence directly linking Rivera to other members of the conspiracy, in addition to Panzardi, such knowledge was an obvious inference. Distribution of marihuana requires a number of outlets. Rivera must have known that storing the marihuana at his house was preliminary to distributing it for sale. In this connection we note that Panzardi testified that Rivera was given a bale of marihuana for the use of his house, which he turned over to a friend to sell for him. It can be inferred from this that Rivera was no stranger to the distribution and sale of marihuana. While it is true that there is no evidence Rivera was told of the scope and extent of the enterprise, he must have known that it was of some magnitude. A truckload of marihuana is not obtained without organization and planning. Rivera's position is similar to that of the cocaine seller in United States v. Moosey, 735 F.2d 633, discussed supra. The fact that he participated in one step of the distribution chain, knowing that it must extend beyond his individual role, is sufficient to make him part of the enterprise that Panzardi directed.
 
 
 24
 The same evidence is sufficient for a conviction on the substantive count--aiding and abetting in intentionally possessing marihuana for distribution. Since Rivera willingly allowed his house to be used as a storage depot for the marihuana, he could be found to be an aider and abettor.
 
 
 25
 The conviction of Rivera-Santiago is affirmed.
 
 
 26
 B. NO. 87-1581, NESTER CANCEL-HERNANDEZ, A/K/A PAPO
 
 
 27
 Defendant Cancel was convicted on count one and on count three of the lesser-included offense of intentionally possessing in April of 1982 less than one thousand pounds of marihuana. He raises three issues on appeal: (1) the evidence was insufficient to prove his knowledge of the charged conspiracy; (2) that there was a prejudicial variance between the single conspiracy alleged in the indictment and the multiple conspiracies proved at trial; (3) that co-conspirator hearsay statements were improperly admitted.
 
 
 28
 The evidence as to Cancel's involvement is as follows. In late 1981 or early 1982 Panzardi told Cancel that he wanted to find someone who knew about airfields in Puerto Rico. Cancel replied that Cesar Castro, who subsequently became Panzardi's chief lieutenant, had such knowledge. Luis Viera Lourido, an indicted defendant who was a witness for the government, testified that he had met Cesar Castro at Cancel's home. Between four and five hundred pounds of marihuana, from the sea smuggle, were delivered to Cancel. One or two days prior to the delivery of the marihuana to Cancel, Panzardi and Cancel had a conversation in which Panzardi told Cancel about the marihuana, and Cancel told him to bring it over. When Panzardi was asked how Cancel paid for the marihuana, he answered: "The way it was done on previous occasions, different dates.... He would give me twenty-five thousand; in a couple of days he would give me another amount. That was the way he used to pay." Panzardi further testified that payments were made after delivery, and he collected the money from Cancel. There was the following testimony from Hector Jesus Padilla Navarez, a defendant who pled guilty. In 1982 Padilla made arrangements for Panzardi to store marihuana in a house near Padilla's residence. Padilla had been told that the marihuana had arrived by boat. There was a large amount of marihuana stored in the house. Padilla helped distribute it to customers who came to the house. One of those that picked up marihuana from the house was Cancel.
 
 
 29
 There are no grounds for excluding the testimony of Panzardi as to what Cancel told him. This testimony falls squarely within the definition of Fed.R.Evid. 801(d)(2)(E). See discussion infra in the case of Ortiz-Ortiz. We therefore find against appellant on the third issue.
 
 
 30
 Cancel's chief defense is that the purchase of the marihuana from Panzardi was but a single transaction and that there is no proof that he knew anything about the conspiracy. There is no doubt that a single sale of drugs without more does not suffice as proof of being part of a conspiracy. United States v. DeLutis, 722 F.2d 902, 905-06 (1st Cir.1983); United States v. Izzi, 613 F.2d at 1210. The question therefore is whether Cancel's contact with the conspiracy was limited to a single purchase of marihuana.
 
 
 31
 We think not. Cancel introduced Cesar Castro to Panzardi because he knew that Panzardi was looking for someone with a knowledge of airfields in Puerto Rico. One of the other defendants, Viera, had met Cesar Castro at Cancel's home. Before delivering the marihuana, Panzardi had called and told him that he had it. Cancel then said, "If you have it bring it over." When Panzardi testified about how Cancel paid for the marihuana, he said that Cancel paid for it "the way it was done on previous occasions." From these facts, the jury could fairly infer: that Cancel was in the business of distributing marihuana; that he had dealt with Panzardi in the past; that he knew from Panzardi's inquiry about airfields that Panzardi was going to import some sort of illegal drugs into Puerto Rico, probably marihuana; and that Panzardi was a regular source of supply for Cancel's marihuana business. The jury could also infer that Cancel must have known that supplying marihuana for distribution and sale requires an organization and planning. It is true that there is no direct evidence of an agreement between Panzardi and Cancel whereby Cancel would act as a distributor for Panzardi. But, as the cases already cited hold, evidence of an agreement can be found from the actions of the parties and the circumstances. Viewing the evidence in the light most favorable to the government, we find that the jury had a solid evidentiary basis for finding beyond a reasonable doubt that Panzardi and Cancel agreed to possess and distribute marihuana within the time frame of count one of the indictment. This is all that is necessary to sustain the conviction on the conspiracy count.
 
 
 32
 Defendant stresses that there is no evidence linking him to the air smuggles. This is true but it is also irrelevant. As already pointed out, count one does not charge any of the defendants with conspiring to smuggle, possess and distribute marihuana. All that is charged is a conspiracy to possess and distribute marihuana between the end of 1981 and the beginning of 1983.
 
 
 33
 We have already held that there was ample evidence from which the jury could have found that this was a single conspiracy, so that disposes of defendant's second challenge based on prejudicial variance. The conviction on count one is affirmed.
 
 
 34
 There can be no serious challenge to the finding that Cancel possessed between four and five hundred pounds of marihuana; the conviction on count three is affirmed.
 
 C. NO. 87-1583, EDWIN ROMERO LOPEZ
 
 35
 In addition to being found guilty on the conspiracy count, (one), Edwin Romero was also convicted on the following counts: two, aiding and abetting in the transportation of marihuana in April of 1982; three, aiding and abetting in the possession of marihuana with the intent to distribute in April of 1982; and, six, aiding and abetting in October and November of 1982 in importing marihuana into the United States. Edwin Romero was not charged on counts four and five, aiding and abetting in the possession and importation of marihuana on September 16, 1982. He was found not guilty on the following counts: seven, aiding and abetting in October and November of 1982 in possessing marihuana with the intent to distribute it; eight, aiding and abetting in the importation of marihuana on or about December 11, 1982; nine, aiding and abetting on December 11, 1982 in the possession of marihuana with the intent to distribute it.
 
 
 36
 This defendant alleges four errors by the trial court: (1) failing to give a requested cautionary instruction about evidence of prior crimes elicited by the government from its own witnesses on direct examination; (2) restricting cross-examination of a government witness; (3) improperly admitting into evidence co-conspirator hearsay statements; and (4) allowing hearsay statements in evidence was a violation of appellant's sixth amendment right "to be confronted with the witnesses against him."
 
 
 37
 (1) The Failure To Give A Requested Cautionary Instruction
 
 
 38
 During a voir dire[3] of the government's chief witness, Panzardi, defendant's counsel moved for a cautionary instruction:
 
 
 39
 Your Honor, at this time I would move for a cautionary instruction and this is because these government witnesses on direct, they're bringing out a series of prior criminal acts which are not the object of this indictment and the jury may be inferring or associating these particular defendants with all these prior criminal acts. And I believe it's proper to avoid that potential prejudice, that the Court give a cautionary instruction to the effect that all of the prior criminal acts the jury should not in any way associate the defendants here that are in trial with all of these prior criminal acts that are being mentioned by the government witnesses. Their own witnesses' prior bad acts.
 
 
 40
 The court refused to give a cautionary instruction, stating: "I don't think it's necessary, frankly. I don't think it's called for at all." All of the defendants joined in objecting to this ruling. There was no request for a continuing objection.
 
 
 41
 The government takes the position that the defendant waived his objection by failing to object when Panzardi testified before the jury about a plea agreement in another case and by failing to object when four other witnesses testified about their plea agreements and other crimes they had committed. We think the government has a valid point. Although the judge's ruling was emphatic and indicated that future objections would be fruitless, defense counsel, absent the grant of a continuing objection, could preserve an "error of law" issue only by continuing to object when the testimony warranted it as the trial progressed. In his charge to the jury the trial judge gave the standard "accomplice" instruction stating, inter alia: "And the fact that an accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person."
 
 
 42
 The record does not show whether a more detailed instruction along the lines suggested at the voir dire of Panzardi was requested, but the record is clear that there were no objections by any defense counsel to the court's final instructions to the jury. The question, therefore, is whether the trial court's failure to give a cautionary instruction when requested constituted reversible error.
 
 
 43
 In United States v. Pelletier, 845 F.2d 1126, 1129 (1st Cir.1988), we found that a standard "accomplice" instruction met defendant's request for a cautionary instruction about the testimony of co-conspirators showing the nature and extent of the conspiracy. We stated: "The court gave a standard cautionary instruction and the defendant requested no further charge." As far as we can determine, this is the only First Circuit case in the general target area. We therefore turn to other circuits.
 
 
 44
 The general rule seems to be that a cautionary instruction should be given, if requested, but the failure of the trial court to give one sua sponte is not reversible error. See United States v. Smith, 790 F.2d 789, 793-94 (9th Cir.1986); United States v. Christian, 786 F.2d 203, 214 (6th Cir.1986); United States v. Ojukwa, 712 F.2d 1192, 1194 (9th Cir.1983); United States v. DeLucca, 630 F.2d 294, 299 (5th Cir.1980), cert. denied, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 819 (1981); United States v. Rothman, 463 F.2d 488, 490 (2d Cir.), cert. denied, 409 U.S. 956, 93 S.Ct. 291, 34 L.Ed.2d 231 (1972). This case, however, does not fit neatly into this category.
 
 
 45
 We have no difficulty finding that the cautionary instruction should have been given. Panzardi and the other co-conspirator government witnesses testified freely, almost cheerfully, about a long list of drug-related crimes which they had committed. Gloria Nieves testified that she had been sentenced to six years for complicity in the murder of an informant. There was a real and palpable risk of guilt by association. We agree with the Ninth Circuit:
 
 
 46
 Evidence of [ ] guilty pleas is amenable to misuse. Without instruction, it is possible the jury could use the pleas as evidence of [ ] guilt. This danger may be averted only by adequate cautionary instructions.... The most effective practice would be to instruct the jury when the evidence of the plea is admitted, and again in final instructions.
 
 
 47
 United States v. Halbert, 640 F.2d 1000, 1006 (9th Cir.1981).
 
 
 48
 The question, however, is whether the refusal of the district court to give a cautionary instruction when requested was reversible error. Three criteria must be met in order to find reversible error. The requested instruction must be: (1) substantially correct; (2) not substantially given in the charge to the jury; and (3) the failure to give it substantially impaired defendant's ability to present a specific defense. United States v. Williams, 809 F.2d 75, 86 (1st Cir.1986), cert. denied, Blandin v. United States, 481 U.S. 1030, 107 S.Ct. 1959, 95 L.Ed.2d 531 (1987). We cannot say that the tripartite test for reversible error was met here. The requested instruction was substantially correct, but it was covered adequately, if not fully, in the charge and the failure to give it was not fatal to any facet of Edwin Romero's defense. Moreover, the failure to object to the testimony of the government witnesses when presented to the jury and the failure to object to the final charge to the jury amounted to a waiver of the voir dire request for a cautionary instruction.
 
 
 49
 (2) The Restriction On Cross-Examination
 
 
 50
 There can be no doubt that the confrontation clause of the sixth amendment includes the right of cross-examination. Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109-10, 39 L.Ed.2d 347 (1974); Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). This right, however, is not boundless. "The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." United States v. Alford, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed.2d 624 (1931). See also United States v. Mazza, 792 F.2d 1210, 1228 (1st Cir.), cert. denied, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987); United States v. Silvestri, 790 F.2d 186, 190-91 (1st Cir.), cert. denied, 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986). The test on review of restriction on cross-examination is abuse of discretion. United States v. Tracey, 675 F.2d 433, 437-38 (1st Cir.1982). We now examine the restriction at issue.
 
 
 51
 The witness was Gloria Nieves. She had testified on direct examination that she had pled guilty to aiding and abetting the murder of an informant and had received a sentence of six years. The sentence was part of a plea agreement in which she had agreed to cooperate with the government. On cross-examination defense counsel sought to introduce the sentencing order in which the judge had recommended that Nieves be given a psychiatric evaluation and treatment for possible drug addiction. In the alternative, defense counsel sought to bring out that such a referral order had been made. After initially deciding to allow cross-examination on this subject, the trial judge changed his mind and ruled that the referral order would not be allowed in evidence and no cross-examination on the subject would be allowed.
 
 
 52
 We have no difficulty upholding the ruling of the district court. Defendant is correct that cross-examination of a government witness' psychiatric history is a proper subject of cross-examination. But there was no evidence that Nieves had received psychiatric treatment or had been treated for drug addiction. The referral order was simply a request that the prisoner be given a psychiatric evaluation and treatment for possible drug addiction. We can take judicial notice of the fact that such referral orders are frequently used when the evidence at trial reveals that defendant has used drugs. There was no offer of proof by defendant that Nieves had ever undergone psychiatric treatment or treatment for drug addiction. One of the main objects of cross-examination is to impeach the credibility of witnesses. Davis v. Alaska, 415 U.S. at 315-16, 94 S.Ct. at 1109-10. This, however, does not mean that the basis for impeachment can be suggestion or innuendo with no evidentiary foundation. The jury may well have thought that the referral order by the sentencing judge was a finding that Nieves needed psychiatric treatment. This, of course, is why defendant wanted the order in evidence. But such a conclusion by the jury would have been entirely unwarranted. The district court did not abuse its discretion in prohibiting cross-examination on this subject. We end our discussion by noting that Nieves received a complete and thorough grilling by defense counsel on all matters that properly went to her credibility.
 
 
 53
 (3) Co-Conspirator's Hearsay Statements
 
 
 54
 Federal Rule of Evidence 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. The Supreme Court has recently reiterated the rule governing the admission of such a statement:
 
 
 55
 Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the rule. There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made "in the course and in furtherance of the conspiracy."
 
 
 56
 Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144, (1987).
 
 
 57
 We set forth the statements to which defendant objects in the order in which they were made. Co-conspirator Francisco Vega Estrada, testifying as a government witness, stated: "The van arrived, loaded with marijuana and I was informed that the person that was travelling in the van was the brother of the owner of the house, for me not to be concerned, that they were related, they were family." The person that told Vega that the driver of the van was "family" was never identified. This would render Vega's statement inadmissible: it did not meet the requirements of Fed.R.Evid. 801(d)(2)(E). But there was no objection to the statement. Fed.R.Evid. 103(a)(1) provides:
 
 
 58
 (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
 
 
 59
 (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.
 
 
 60
 Defense counsel's motion at the close of the evidence to strike the statement does not meet the requirement of the rule that there be a "timely objection." Defendant's contention that the statement was improperly admitted is rejected.
 
 
 61
 After Vega made the hearsay statement, he was asked: "Have you seen that person that was driving that van that night today?" He answered "yes" and then made a courtroom identification of defendant. The answer and courtroom identification was not a statement as defined in Fed.R.Evid. 801(d)(2)(E). It was direct testimony, not "a statement made by a coconspirator of a party during the course and in furtherance of the conspiracy."
 
 
 62
 The next statement, to be exact series of statements, was by Panzardi. He testified that defendant was one of the ones that helped unload the marihuana from the Survive in the sea smuggle. Panzardi testified that he knew who did the unloading because "I had to pay them." Defendant was identified as one of the unloaders. In further testimony about the sea smuggle Panzardi testified that he did not personally pay Vega and then stated: "The one whom I had put in charge of paying everyone was Cesar." When asked what happened to the twelve or thirteen hundred pounds of marihuana from the sea smuggle that remained in one of the storage houses, Panzardi stated: "Well, from that we spoke, Cesar, Nando and myself and we agreed that from that marijuana Cesar would receive his pay, Frank would receive his pay and Nando would receive his pay. And Cesar in turn would pay the other guys that were Wilberto, his brother and Vivique."
 
 
 63
 Leaving aside the failure of defendant to object timely to any of these statements, we point out that Panzardi's first statement about paying the unloaders and then identifying defendant was, like Vega's courtroom identification of defendant, not a statement within the definition of Fed.R.Evid. 801(d)(2)(E). Panzardi stated directly that defendant helped unload the marihuana and identified him. It is true that his statement that he paid the unloaders is at variance with his subsequent statements as to how payments were made. This, however, was a matter for cross-examination and ultimately for the jury. Panzardi's statements did not implicate Fed.R.Evid. 801(d)(2)(E).
 
 
 64
 There was also testimony by Gloria Nieves which defendant claims should have been excluded as hearsay. She testified that she had seen the defendant at his brother's house the night a truckload of marihuana from the sea smuggle was brought to the house. Nieves made a courtroom identification of defendant. She further testified that defendant and two others, Wilfred and Alvaro, unloaded the marihuana from the truck that brought it. None of this testimony was hearsay or within the ambit of Fed.R.Evid. 801(d)(2)(E). It was properly admitted.
 
 
 65
 (4) The Sixth Amendment Right to Confrontation
 
 
 66
 Based upon our analysis and rulings, there can be no confrontation clause issue. Moreover, the Court in Bourjaily agreed with the court of appeals "that the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause, and since the statements were admissible under the Rule, there was no constitutional problem." 107 S.Ct. at 2782.
 
 
 67
 The conviction of Edwin Romero Lopez is affirmed.
 
 D. NO. 87-1650, LUIS A. ROMERO LOPEZ
 
 68
 This defendant was found guilty on count one, the conspiracy count, and also convicted on the following counts: two, aiding and abetting in importing marihuana in April of 1982; three, aiding and abetting in possessing with intent to distribute marihuana in April of 1982; six, aiding and abetting in importing marihuana in October and November of 1982; seven, aiding and abetting in possessing with intent to distribute marihuana in October and November of 1982; eight, aiding and abetting in importing marihuana on or about December 11, 1982; and nine, aiding and abetting in possessing with intent to distribute marihuana on or about December 11, 1982. Defendant was not charged on counts four and five of the indictment.
 
 
 69
 Appellant raises three issues: (1) that he was prejudiced because, although a single conspiracy was charged, the evidence at trial established multiple conspiracies; (2) the conviction was the product of an invalid indictment; and (3) the district court erred in finding him a dangerous special drug offender. Before we start our consideration of the issues, we note that appellant was frequently referred to as "Nando" during the trial and that he is the brother of defendant Edwin Romero Lopez. We use the name Nando to refer to this defendant when appropriate.
 
 
 70
 (1) Single vs. Multiple Conspiracies
 
 
 71
 Appellant argues that there were four separate and distinct importations of marihuana and that each of them constituted a separate conspiracy, not the single conspiracy charged in count one. It is true that there were four separate importations but as has been already pointed out, the conspiracy charge was not that defendant and others conspired to smuggle marihuana into Puerto Rico but that he and others conspired to possess with intent to distribute marihuana between the end of 1981 and the first part of 1983. The evidence was overwhelming that defendant was part of such a conspiracy.
 
 
 72
 Defendant participated in the unloading of the marihuana obtained in the sea smuggle and his house was used as a storage depot for a portion of it. According to Panzardi, "Nando" arranged with one of the security guards employed at the Palmas del Mar resort to act as a lookout during the unloading of the marihuana smuggled in by sea; the unloading took place at Palmas del Mar. It was the defendant who paid the guard the agreed upon price of fifteen thousand dollars for his services during the sea smuggle. It could be fairly inferred from the evidence that defendant also paid the guard to act as a lookout for the air smuggles; the landing field used was at Palmas del Mar. Prior to the first air smuggle, Panzardi, his chief lieutenant Castro, and another conspirator, Wilberto, met at "Nando's" house. Panzardi and his henchmen also met at "Nando's" house prior to the plane landing in the second air smuggle. Defendant was directly involved in the third and last air smuggle. He was present when the plane landed and helped unload the marihuana. This evidence was sufficient to convict defendant as charged in count one and even on appellant's theory of four separate conspiracies, he could have been found guilty of participation in all four. The evidence is also sufficient to sustain the convictions on the substantive counts.
 
 
 73
 (2) The Validity of the Indictment
 
 
 74
 Appellant claims that the testimony before the grand jury of the government's main witness, Panzardi, an admitted perjurer, is "suspect," and that the indictment against him, therefore, must be dismissed. He relies on two Ninth Circuit cases, United States v. Samango, 607 F.2d 877 (9th Cir.1979) and United States v. Basurto, 497 F.2d 781 (9th Cir.1974). In Samango, an indictment dismissal was upheld due to flagrant and numerous instances of prosecutorial misconduct which resulted in a biased jury. In Basurto, the due process protection of the fifth amendment was the basis for dismissing an indictment where the prosecutor was informed prior to trial by a witness that he, the witness, had lied before the grand jury as to an issue material to the sentencing of the defendant.
 
 
 75
 It is well established that "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). See Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The Supreme Court has also held that an indictment returned by a legally constituted and unbiased grand jury "is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." United States v. Calandra, 414 U.S. 338, 363, 94 S.Ct. 613, 627, 38 L.Ed.2d 561 (1974). The prosecutor before a grand jury is not normally under a duty to disclose exculpatory evidence. United States v. Bucci, 839 F.2d 825, 831 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 117 (1988); United States v. Wilson, 798 F.2d 509, 517 (1st Cir.1986). See also United States v. Page, 808 F.2d 723, 727-28 (10th Cir.), cert. denied, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987). Nor, contrary to what appellant infers, is the prosecutor obligated to impeach the credibility of his own witnesses. Bucci, 839 F.2d at 831. See United States v. Smith, 552 F.2d 257, 261 (8th Cir.1977); cf. United States v. Calandra, 414 U.S. at 344-45, 94 S.Ct. at 618-19.
 
 
 76
 Turning first to the prosecutorial misconduct theory, it is difficult to see how the facts in this case are similar to the facts in Samango, as appellant's brief suggests. In Samango, the primary concern of the court was that the grand jury was unable to determine the credibility and sufficiency of the testimony presented before them in the form of a 1,000-page transcript which "could have lulled the jurors into accepting the testimony as true, without actually noticing that it was the prosecutor who was supplying the testimony." Samango, 607 F.2d at 881. Here, Panzardi testified in person before the grand jury, which thus had an opportunity to asses his credibility.
 
 
 77
 In any case, appellant has failed to meet the burden of establishing prosecutorial misconduct.
 
 
 78
 The standard for the dismissal of an indictment due to prosecutorial misconduct places a heavy burden upon appellants: "The basic rule is that, because of the constitutionally mandated independence of the grand jury and the prosecutor, courts should be reluctant to dismiss an indictment. A dismissal, therefore, will be ordered only for serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process."
 
 
 79
 United States v. Giorgi, 840 F.2d 1022, 1030 (1st Cir.1988) (quoting United States v. Ogden, 703 F.2d 629, 636 (1st Cir.1983)). Accord United States v. Rodriguez, 738 F.2d 13, 16 (1st Cir.1984) (dismissal of indictment due to prosecutorial misconduct is extraordinary remedy). There is no evidence here of "serious and blatant prosecutorial misconduct" that distorted the integrity of the judicial process.
 
 
 80
 It must also be noted that in Samango, the court upheld a district court dismissal of an indictment based on a pretrial challenge, rather than a challenge after a trial on the merits. In United States v. Al Mudarris, 695 F.2d 1182 (9th Cir.), cert. denied, 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983), where the prosecutor's behavior was similar to the behavior in Samango, the Ninth Circuit refused to dismiss an indictment when the defendant challenged the indictment after conviction. Id. at 1188. We have recognized the extraordinary nature of a post conviction dismissal of an indictment. In Pocardo v. United States, 784 F.2d 38 (1st Cir.), cert. denied, 479 U.S. 916, 107 S.Ct. 320, 93 L.Ed.2d 293 (1986), we stated: "the sanction, however, of dismissing an indictment after a defendant has been convicted of an offense is employed in only truly extreme cases of egregious prosecutorial misconduct." Id. at 44. In the instant case, the defendant asks for the indictment to be dismissed after trial and has raised the issue for the first time on appeal. Since this is neither an exceptional case, nor the error obvious, or one affecting the fairness and integrity of the trial, the indictment cannot be dismissed. See United States v. Murphy, 762 F.2d 1151, 1155 (1st Cir.1985).
 
 
 81
 As for appellant's due process theory under Basurto, he must establish that the government knew the indictment was based partially on perjured testimony which is material. Basurto, 497 F.2d at 785. This is different than using a witness who has committed perjury in the past. Moreover, even assuming grand jury bias resulting from its ignorance of Panzardi's tendency to lie under oath, this error was cured by the verdict of the petit jury, which was made aware during trial of Panzardi's past perjury. See United States v. Mechanik, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986).
 
 
 82
 We find that the indictment was valid.
 
 
 83
 (3) The Sentencing
 
 
 84
 Defendant claims that the district court erred in finding him a special and dangerous drug offender and giving him an enhanced sentence. The pertinent parts of the statute in effect at the time of sentencing, since repealed, provide:
 
 
 85
 (e) A defendant is a special drug offender for purposes of this section if--
 
 
 86
 (1) [not applicable], or
 
 
 87
 (2) the defendant committed such felonious violation as part of a pattern of dealing in controlled substances which was criminal under applicable laws of any jurisdiction, which constituted a substantial source of his income, and in which he manifested special skill or expertise; or
 
 
 88
 (3) such felonious violation was, or the defendant committed such felonious violation in furtherance of, a conspiracy with three or more other persons to engage in a pattern of dealing in controlled substances which was criminal under applicable laws of any jurisdiction, and the defendant did, or agreed that he would, initiate, organize, plan, finance, direct, manage, or supervise all or part of such conspiracy or dealing, or give or receive a bribe or use force in connection with such dealing.
 
 
 89
 (f) A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felonious violation is required for the protection of the public from further criminal conduct by the defendant.
 
 
 90
 21 U.S.C. Sec. 849(e) and (f).
 
 
 91
 In addition to the trial evidence which established that defendant was deeply involved as one of the chief lieutenants of Panzardi in the marihuana smuggling venture, there was also evidence adduced at the sentencing hearing from which the following could be found: In 1983, defendant was involved with Panzardi in importing seven kilos of cocaine into Puerto Rico. Defendant helped Panzardi import two loads of marihuana from Tortola; each time he was paid between seven and eight thousand dollars. While working for someone other than Panzardi in importing marihuana, defendant was involved in a shooting in Humacao. Defendant helped unload and store a planeload of marihuana in a smuggle involving Cesar Castro and a Mr. Vladamir.
 
 
 92
 We find no error in the district court's determination that defendant was a special and dangerous drug offender under 21 U.S.C. Sec. 849(e) and (f).
 
 
 93
 The conviction of Luis Romero Lopez is affirmed.
 
 
 94
 E. NO. 87-1649, HENRY CASTRO-POUPART A/K/A QUIQUE
 
 
 95
 Castro-Poupart was charged in counts one, seven and nine of the indictment. Count seven was dismissed at trial after the government conceded the lack of evidence against defendant. The jury found defendant guilty on count one, the conspiracy count and count nine, aiding and abetting in possessing with intent to distribute marihuana on or about December 11, 1982.
 
 
 96
 Appellant raises two issues: that the evidence was insufficient to convict him on the conspiracy count, and that the district court erred in sentencing him.
 
 
 97
 (1) The Sufficiency Of The Evidence On The Conspiracy Count
 
 
 98
 Appellant has not appealed his conviction on count nine, aiding and abetting in possessing marihuana with intent to distribute it. This is a realistic view of the evidence. His contention is that the evidence is insufficient to establish that he entered into a conspiratorial agreement. The evidence can be summarized as follows: A truckload of marihuana from the third plane smuggle was stored at defendant's house. The truck with the marihuana first went to the house of one Angel-Rosa-Collazo but it was too big to fit into the carport. Panzardi and Cesar then decided to take the marihuana to defendant's house because, in Panzardi's words, "I knew him and he had worked with me and Cesar decided to take it there." Panzardi also testified that defendant was one of those who took part in selling the marihuana.
 
 
 99
 Based on this evidence, two inferences could be made: (1) defendant must have known when the truckload of marihuana arrived at his house that there was a marihuana distribution scheme of some magnitude; and (2) that the marihuana was taken to defendant's house without advance notice after the storage place originally chosen turned out to be inadequate meant that defendant and Panzardi had a working relationship. Defendant's participation in the distribution of the marihuana gives credence to these inferences. This evidence was sufficient for the jury to find that the defendant participated in a conspiracy to possess marihuana with intent to distribute it, as charged in count one.
 
 
 100
 (2) The Sentencing
 
 
 101
 Appellant mounts two challenges to his sentence: (1) that he should not have been sentenced as a special and dangerous drug offender; and (2) that the court erred in including special parole terms in his sentences on both counts.
 
 
 102
 The pertinent provisions of the special and dangerous drug offender statute, 21 U.S.C. Sec. 849(e) and (f), have already been set forth. Unlike the case of Luis Romero Lopez, supra, the evidence adduced at trial against this defendant was not sufficient for a finding that he was a special and dangerous drug offender. Whether the requirements of the statute were met, therefore, depends entirely on the evidence submitted at the sentencing hearing held on June 29 and 30, 1987. This evidence was as follows.
 
 
 103
 Defendant approached Panzardi and told Panzardi that he had a connection in Chicago and that if Panzardi put up the money, they could buy "half a key" of heroin. Panzardi gave defendant fifteen or twenty thousand dollars and defendant made the arrangements for two women to bring the heroin from Chicago to San Juan. Defendant helped sell the heroin which was disposed of at a substantial profit.
 
 
 104
 In 1984 defendant picked up a load of eight to ten thousand pounds of marihuana at a desolate area in Fajardo. Defendant was familiar with the pick-up site. Panzardi paid defendant seven to eight thousand dollars for his services, which included selling part of the marihuana.
 
 
 105
 Defendant also sold marihuana that he had obtained from Panzardi's brother. Defendant's main base for drug selling was located in a housing project.
 
 
 106
 Panzardi sent defendant to St. Martin with a person by the name of Kike Oliver to pick up ten kilos of cocaine. Defendant picked up the cocaine and, after wrapping it suitably, dropped it into the water where Panzardi was waiting to retrieve it. Defendant was paid ten thousand dollars for this chore.
 
 
 107
 Panzardi sold three or four ounces of uncut heroin to defendant in 1985 for six thousand dollars an ounce. Defendant then cut the heroin and sold it.
 
 
 108
 This evidence was sufficient for a finding by the district court that Castro-Poupart was a special and dangerous drug offender under 21 U.S.C. Sec. 849(e) and (f).
 
 
 109
 The next sentencing issue is the imposition of a special parole term of five years on counts one and nine, to be served concurrently. The government agrees that the special parole term imposed on count one was error because it violated the teaching of Bifulco v. United States, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). Although we are not without some doubt, we are constrained to find that the special parole term imposed on count nine was also error. We think that United States v. Santamaria, 788 F.2d 824 (1st Cir.1986), controls. In that case we pointed out:
 
 
 110
 Prior to amendment in October 1984, the penalty provisions set forth in 21 U.S.C. Sec. 841(b)(1)(A) (1982) required imposition of a special parole term upon a person convicted under 21 U.S.C. Sec. 841(a) of an offense involving a narcotic drug. Those penalty provisions were recast by section 502 of the Comprehensive Crime Control Act of 1984, 21 U.S.C.A. Sec. 841(b)(1)(A) (West Supp.1985). The new provisions prescribe penalties of different magnitudes depending upon the amount of narcotics involved in an offense, and raise the maximum penalties. Under the new provisions, however, a special parole term, while mandatory for offenses involving less than one kilogram of narcotic drug, is not authorized for an offense that involves one kilogram or more of a narcotic drug--an offense for which Santamaria was convicted. Thus, there is no basis here for the imposition of a special parole term, and that provision of the sentence is vacated.
 
 
 111
 Id. at 829. The same reasoning would seem to apply here. Although it may be of small moment, considering the length of incarceration to be served, the special parole terms provisions imposed on count one and count nine are vacated. In all other respects, the conviction and sentence of Henry Castro-Poupart is affirmed.
 
 F. NO. 87-1582, MANUEL ORTIZ-ORTIZ
 
 112
 Manuel Ortiz-Ortiz was charged in all nine counts of the indictment. He was found guilty on counts one, two, four, six and eight and not guilty on the others. There are essentially two issues to be decided: the admissibility of out-of-court statements of co-conspirators and the sufficiency of the evidence.[4] Since the out-of-court statements and the testimony related to them constitute the main evidence against appellant, the two issues are inextricably intertwined. We therefore set forth in detail all the testimony implicating defendant.
 
 
 113
 (1) The Evidence
 
 
 114
 The government established through the testimony of Carmelo Ortiz, director of security at Palmas del Mar, that defendant was employed as security supervisor with a title of sergeant at the time that the sea smuggle and the three air smuggles occurred. Employee time records were introduced; they showed that on the critical dates the defendant was working on the premises.
 
 
 115
 In discussing the plans he had made with Luis Romero Lopez (Nando), Panzardi testified that Nando "had already made arrangements ahead of time regarding Palmas with the sergeant in regard to security." When asked "What do you mean by that?" Panzardi responded: "According to what I understood and according to what he told me that--." There was an objection on hearsay grounds. The court then asked, "Who is Manuel?" Panzardi answered: "We called him the sergeant, Mr. Manuel. He was the person in charge of security at Palmas." The court then asked Panzardi if he knew his name. The reply was: "Manuel. We used to call him the sergeant. I do not recall the last time." (probably meaning last name ). When asked by the court if the person was in the courtroom, Panzardi identified defendant. Panzardi then went on to testify that Ortiz' task was to prevent anyone going onto the side of Palmas del Mar where the marihuana was being unloaded and that he was to be paid fifteen thousand dollars. Panzardi then stated that Cesar Castro was "in charge of paying, and Cesar Castro was going to pay Nando and Nando was going to pay the sergeant." Panzardi was then asked, "Did the sergeant know what the protection was for?" He answered: "He knew." Defendant's objection was overruled. In response to the question, "How is that you knew that he knew," Panzardi stated, "I knew that Nando had spoken to him. He was a person of trust." Defendant objected again; the objection was overruled.
 
 
 116
 In describing the details of the sea smuggle, Panzardi testified that after the marihuana had been unloaded from his boat he drove the boat to the marina at Palmas del Mar and he and Cesar proceeded to clean the inside of it. While they were cleaning it, a vehicle drove up and Panzardi said, "Cesar somebody is there, take a peak [sic] and see who it is." According to Panzardi, Cesar replied, "Don't worry about it, that is the man from here." Panzardi then testified that as Manuel approached the boat, he and Cesar got out of the boat, walked up to Manuel and "exchanged some words that I don't recall." After Manuel left, Panzardi and Cesar resumed cleaning up the boat. There was no objection to this testimony.
 
 
 117
 In testifying about the September air smuggle, Panzardi stated that it had been agreed that the shipment would arrive early, "because the sergeant changed shifts, I think it was at twelve." When asked to whom he was referring, Panzardi replied, "Mr. Manuel Ortiz Ortiz," and then stated: "He is the one that used to insure our security and if someone would arrive he is the one that tell them to go somewhere else." Panzardi further testified that Cesar had paid Ortiz fifteen thousand dollars for his services for the September air smuggle. There was no objection to this testimony.
 
 
 118
 Panzardi also implicated appellant in the second (October) air smuggle. When asked what arrangements had been made to pick up the shipment at Palmas del Mar, he testified that he had spoken to Cesar, who had taken care of everything with Manuel Ortiz. Panzardi further testified that when he was told that Ortiz was asking for more money for his services for this shipment, seventeen thousand dollars, that he said "Give it to him, there is no problem." There was no objection to this testimony.
 
 
 119
 When Panzardi was being questioned about the third air smuggle (December), he was asked what security arrangements had been made. He replied that everything had been set up: "Nando and Cesar had spoken to the Sergeant, to Mr. Manuel Ortiz." Panzardi further testified that Cesar paid Ortiz seventeen thousand dollars for his services on this smuggle. There was no objection to this testimony.
 
 
 120
 Gloria Nieves Baez also implicated Ortiz. She testified that she noticed Ortiz among the contingent of police that arrived at the Palmas landing strip on December 11, 1982. By the time the police arrived, the marihuana had been unloaded and trucked away. Nieves testified that when she saw Ortiz, she asked Panzardi, "what is this man doing here, he is supposedly working with us?" She then testified that she "knew him as the Palmas del Mar sergeant and I think his name is Manuel." Nieves then made a courtroom identification of Ortiz. Nieves was then asked what Panzardi told her about the sergeant. She replied that Panzardi told her that the sergeant had to be there so that the police would not be suspicious. No objection was made to Nieves' testimony.
 
 
 121
 At the conclusion of the government's case, defendant moved to strike all hearsay statements pertaining to him. As we have already noted, this is not sufficient to meet the timely objection requirement of Fed.R.Evid. 103(a)(1).
 
 
 122
 (2) The Law
 
 
 123
 In Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the Court addressed,
 
 
 124
 three questions regarding the admission of statements under Rule 801(d)(2)(E): (1) whether the court must determine by independent evidence that the conspiracy existed and that the defendant and the declarant were members of this conspiracy; (2) the quantum of proof on which such determinations must be based; and (3) whether a court must in each case examine the circumstances of such a statement to determine its reliability.
 
 
 125
 Id. 107 S.Ct.at 2777-78. At the start of its analysis, the Court stated:
 
 
 126
 Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the rule.
 
 
 127
 Id. at 2778. The Court held "that when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence." Id. at 2779. This, of course, has been the rule in the First Circuit since United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir.1977).
 
 
 128
 The Court discussed at length the effect of Fed.R.Evid. 104 on the boot-strapping rule of Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 and United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). It rejected petitioner's argument "that a court should not consider hearsay statements at all in determining preliminary facts under Rule 801(d)(2)(E)," and held that Rule 104 "on its face allows the trial judge to consider any evidence whatsoever bound only by the rules of privilege." 107 S.Ct. at 2780.
 
 
 129
 Directly relevant to the case at hand is the statement. "We think that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." 107 S.Ct. at 2781. The court went on to note, however, that the out-of-court statements implicating the defendant were "corroborated by independent evidence." Id. The Court then held that the out-of-court statements were properly admitted. Id. at 2782. Finally, the Court held "that the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." Id. at 2783 (footnote omitted).
 
 
 130
 We now apply the teaching of Bourjaily to the case before us. There can be no question that Panzardi's testimony established that there was a conspiracy involving at least himself, Cesar and Nando to possess marihuana with intent to distribute it as charged in count one. The proof of such conspiracy did not rest on hearsay statements. The statements made by Cesar and Nando and testified to by Panzardi implicating defendant in the conspiracy were statements "by a co-conspirator of a party during the course of and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). That portion of Panzardi's testimony in which he stated that the defendant knew what the protection was for because, "I (Panzardi) knew that Nando had spoken to him. He was a person of trust," should have been stricken. It did not fall within the definition of Fed.R.Evid. 801(d)(2)(E). This statement, however, was not crucial and its admission was harmless error.
 
 
 131
 There was, as in Bourjaily, independent evidence that corroborated the out-of-court statements. The government proved by testimony and time records that a person with the name of Manuel Ortiz-Ortiz worked as a security guard in the position of sergeant for Palmas del Mar, and that he was on the premises at the critical times. The testimony of Panzardi that he and Cesar talked to the defendant on the morning after the sea smuggle at the Palmas del Mar marina was not an out-of-court statement. It is true that prior to meeting defendant, Panzardi testified that he had been told by Cesar that the person approaching the boat was the security guard that was in their pay; this was an 801(d)(2)(E) statement. But Panzardi's testimony that he talked to the defendant was independent evidence, just as was his courtroom identification. That Panzardi did not remember the subject of the conversation between defendant and himself bore on credibility, not admissibility.
 
 
 132
 Finally, we point out that the out-of-court statements to which there were no timely objections were properly before the jury. What the Court stated in Bourjaily is pertinent: "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." 107 S.Ct. at 2781.
 
 
 133
 Bourjaily also dooms appellant's confrontation clause challenge to the out-of-court statements. 107 S.Ct. at 2782-83.
 
 
 134
 We hold that the co-conspirator's out-of-court statements to which objections were made were properly admissible, except as noted. We also hold that the evidence was sufficient for a finding of guilty beyond a reasonable doubt on those counts on which defendant was convicted. The conviction of Manuel Ortiz-Ortiz is affirmed.
 
 SUMMARY
 
 135
 The judgments and sentences in all cases are affirmed except that in the case of Henry Castro-Poupart the special parole terms imposed are vacated. That case is remanded for correction of the sentence.
 
 
 
 [1]
 Also spelled marijuana and marajuana
 
 
 [2]
 Rivera was acquitted on count two, aiding and abetting in April of 1982 in intentionally importing marihuana into the United States
 
 
 [3]
 The voir dire was held outside the presence of the jury
 
 
 [4]
 Defendant also appealed the restriction on cross-examination of Gloria Nieves Baez. This issue was discussed and decided in the case of Edwin Romero Lopez. Our holding that it was not error to refuse to allow disclosure of the sentencing order of Nieves applies with equal force to Ortiz' appeal