905 F.2d 483
 31 Fed. R. Evid. Serv. 234
 UNITED STATES of America, Plaintiff, Appellee,
v.
Emigdio APONTE-SUAREZ, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Angel S. PEREZ-MORALES, a/k/a Tato, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Guillermo AROCHO-MEJIAS, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Jose Antonio BAEZ-RODRIGUEZ, a/k/a Tony, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Nellie MIRANDA-DIAZ, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Khalid MUNOZ-MORALES, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Carlos M. VIVO-MONTERO, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Jose Antonio AQUINO-NUNEZ, Defendant, Appellant.
UNITED STATES of America, Plaintiff, Appellee,
v.
Andres VOLMAR-FIGUEROA, a/k/a Charmi, Defendant, Appellant.
 Nos. 88-1852, 88-2165 to 88-2167, 88-1853 to 88-1859 and 88-2168.
 United States Court of Appeals,
First Circuit.
 Heard Nov. 1, 1989.
Decided May 23, 1990.
 
 Albert F. Tellechea, Orlando, Fla., for appellant Emigdio Aponte- Suarez.
 Nydia Maria Diaz-Buxo, Caguas, P.R., for appellant Angel Perez-Morales.
 Joseph C. Laws, San Juan, P.R., for appellant Guillermo Arocho-Mejias.
 Rafael Gonzalez-Velez, Hato Rey, P.R., for appellant Jose Antonio Baez- Rodriguez.
 Luis A. Medina-Torres, for appellant Nellie Miranda-Diaz.
 Antonio Bauza-Torres, for appellant Khalid Munoz-Morales.
 Lydia Lizarribar-Masini, for appellant Carlos M. Vivo-Montero.
 Jose Antonio Pagan, for appellant Jose Antonio Aquino-Nunez.
 Frank D. Inserni, Hato Rey, P.R., for appellant Andres Volmar-Figueroa.
 Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., with whom Daniel F. Lopez-Romo, Hato Rey, P.R., U.S. Atty. for the D. of Puerto Rico, were on brief for appellee.
 Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and COFFIN, Senior Circuit Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 Nine defendants appeal their various convictions for conspiracy to import marijuana and cocaine, attempted importation of marijuana, importation of marijuana and cocaine, and possession with intent to distribute marijuana and cocaine, in violation of 21 U.S.C. Secs. 963, 952 and 841(a)(1).
 
 FACTS
 I. THE FAILED IMPORTATION ATTEMPT
 
 2
 In March 1985, Luis Viera was released from prison and began plans for importing marijuana. He discussed his importation plans with Angel Perez-Morales who introduced Viera to Emigdio Aponte-Suarez to discuss airplane arrangements. They held a second meeting, this time including appellants Guillermo Arocho-Mejias and Jose Antonio Baez-Rodriguez, the pilots of the prospective plane. The parties agreed to fly to Colombia and bring back a load of marijuana. Aponte-Suarez, Perez-Morales, Arocho-Mejias, Baez-Rodriguez and Viera held a third meeting. At this meeting they discussed offloading sites in Barceloneta and Vega Baja, Puerto Rico. On August 27, 1985, Perez-Morales, Arocho-Mejias, and Baez-Rodriguez departed for Colombia. Later that afternoon those remaining separated into two groups and departed to the airstrips. Aponte-Suarez went to Barceloneta. Others went to the strip in Vega Baja.
 
 
 3
 The airplane failed to return. Viera discovered that the plane landed elsewhere and that Colombian police arrested the three occupants. In an effort to help his friends, Viera contacted Jose Barliza in Colombia. Barliza said that he would help secure the release of Viera's flight crew. Barliza obtained a Colombian lawyer and told Viera to prepare a document describing the flight as a purely domestic flight designed to test the navigation instruments. This and other efforts were made to free Perez-Morales, Arocho-Mejias and Baez- Rodriguez from Colombian prison.
 
 II. IMPORTING MARIJUANA AND COCAINE
 
 4
 Despite the failure of his first attempt, Viera decided to proceed with another importation venture. In efforts to secure a different airstrip in Puerto Rico, Viera went to the home of Andres Volmar-Figueroa in Cerro Gordo, Puerto Rico. Viera asked for permission to use a farm leased by Volmar. Volmar, however, demanded half the profits in exchange for the use of the land, which Viera rejected. Volmar then introduced Viera to Jose Antonio Aquino- Nunez who had access to another airstrip. Viera offered to pay Aquino-Nunez $15,000 for the use of the airstrip. Aquino-Nunez agreed.
 
 
 5
 Viera arranged the marijuana delivery. He went to the home of Khalid Munoz-Morales, where appellant Carlos M. Vivo-Montero was also present. Viera asked Munoz-Morales to purchase fuel for the airplane and both Munoz and Vivo agreed. Viera made other preparations for the importation, including: securing a "stash site" and the hiring of two women to enter the plane after the offloading. These women would then accompany the pilots to the Virgin Islands, giving the appearance they had been on a pleasure trip. One of the women hired was Nellie Miranda-Diaz.
 
 
 6
 The plane flew to Colombia and returned to the airstrip with the marijuana and cocaine. Before the plane returned to the airstrip Munoz-Morales and Vivo-Montero purchased fuel and transported it to the airstrip. Viera and Aquino- Nunez were present during the offloading. The marijuana and cocaine were removed from the plane without incident, the plane was refueled and then boarded by Miranda-Diaz and her female companion with its final destination being St. Croix. In the following weeks the marijuana and cocaine were sold, and participants in the venture were paid. Munoz-Morales and Vivo-Montero shared $5,000, while Miranda-Diaz received $3,000.
 
 III. IMPORTING 96 KILOGRAMS OF COCAINE
 
 7
 Viera set up another cocaine importation. Arrangements were made for the three men who had been jailed in Colombia during the failed importation attempt to return during this trip. Viera contacted Aquino-Nunez and received permission to use his airstrip in Puerto Rico again. Viera told Aquino that he would pay him between $25,000 and $30,000. It was arranged that Munoz-Morales would again supply the fuel. Munoz and Vivo-Montero picked up the gasoline containers and filled them with fuel at Isla Grande Airport. Viera also arranged for the same two women to accompany the pilots on a feigned pleasure trip to St. Croix after the offloading.
 
 
 8
 On the appointed date, while the pilots took off for Colombia, the others went to the airstrip. The plane arrived at about 9:30 p.m. Four suitcases were removed, but only Perez-Morales and Arocho-Mejias deplaned. Baez-Rodriguez remained in Colombia, there having been no room for him on the plane.
 
 
 9
 The women boarded the plane, and it then was refueled. The suitcases containing 96 kilograms of cocaine were secreted in the stash site. Aponte- Suarez informed Viera that 56 kilograms belonged to him. Viera confirmed this information and then demanded some payment for bringing about the successful importation. The parties agreed that ten kilograms would be paid to Viera for transportation.
 
 
 10
 The next day Aponte-Suarez, Perez-Morales and Arocho-Mejias came to Viera's apartment. Aponte demanded his portion of the cocaine load. Viera promised to deliver it later that afternoon. After retrieving the cocaine from the stash site, Viera transferred 46 kilograms to Aponte-Suarez. Viera distributed the remaining 50 kilograms.
 
 
 11
 The cocaine was sold for $25,000 per kilogram. From the proceeds Viera gave Aquino $30,000. Munoz and Vivo shared a payment of $5,000 and Miranda received $3,000.
 
 DISCUSSION
 
 12
 I. A SINGLE CONSPIRACY WAS CHARGED AND PROVEN[1]
 
 
 13
 Appellants contend that the indictment was defective because, on its face, it reveals multiple conspiracies rather than the single conspiracy alleged. Additionally, they assert that even if the indictment was correct, the government proved multiple conspiracies, and that the criminal acts charged in the conspiracy count were impermissibly charged as separate substantive offenses.
 
 
 14
 Count 1 charged 27 individuals with conspiracy to import marijuana and cocaine. The count in the indictment listed 40 overt acts that described the essence of the three importation ventures organized by Viera. The seven substantive counts charged appellants with criminal acts of importation and possession of drugs with the intent to distribute. With the conspiracy charge linking the substantive offenses, the indictment on its face was clearly valid. United States v. Scivola, 766 F.2d 37, 41 (1st Cir.1985); United States v. Arruda, 715 F.2d 671, 678 (1st Cir.1983); Fed.R.Crim.P. 8(a). Because the substantive offenses were distinct crimes, they were properly set forth in the indictment as separate offenses. United States v. Bosch, 584 F.2d 1113, 1118 (1st Cir.1978) (citing Iannelli v. United States, 420 U.S. 770, 777-78, 95 S.Ct. 1284, 1289-90, 43 L.Ed.2d 616 (1975)) (generally, a defendant may be prosecuted for both conspiracy and the underlying offense).
 
 
 15
 The conspiracy count cannot be reasonably read as alleging three separate conspiracies. Rather, it charged a single conspiracy with the single objective to import drugs. The overt acts gratuitously set forth in the indictment, see United States v. Jackson, 845 F.2d 1262, 1265 (5th Cir.1988); United States v. Cruz, 568 F.2d 781, 782 (1st Cir.1978), did nothing more than particularize the scope of the conspiracy and did not invalidate an otherwise valid indictment.
 
 
 16
 Furthermore, multiple conspiracies were not proved at trial. The government's proof established the existence of a single agreement with a single objective. Three attempts were made to secure that objective and two of them succeeded. In each episode, Viera was the mastermind and others were central figures. Appellants advancing the multiple conspiracy argument, admittedly participated in less than all of the three ventures. However, "[t]he fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies." United States v. Drougas, 748 F.2d 8, 17 (1st Cir.1984). See also United States v. Garcia-Rosa, 876 F.2d 209, 223 (1st Cir.1989); United States v. Arruda, 715 F.2d at 678.
 
 
 17
 In any event, the existence of a single conspiracy was a question of fact relegated to the province of the jury. United States v. Garcia-Rosa, 876 F.2d at 223; United States v. Dwyer, 843 F.2d 60, 61-62 (1st Cir.1988); United States v. Drougas, at 17. The jury was properly instructed and admonished that appellants were not on trial for any offenses not charged in the indictment. We will not disturb the findings of the jury here.
 
 II. SUFFICIENCY OF EVIDENCE
 
 18
 We view all evidence and reasonable inferences drawn therefrom in the light most favorable to the government. United States v. Esnoel Lopez-Pena, No. 87-2003, slip op. at 4-5, 1989 WL 140125 (1st Cir. Nov. 22, 1989); United States v. Rivera-Santiago, 872 F.2d 1073, 1078-79 (1st Cir.1989). The weight and credibility of the witnesses are matters for the trial court only. Glasser v. U.S., 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). As such, the verdict will be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Cintolo, 818 F.2d 980, 983 (1st Cir.1987). To facilitate our analysis, we apply the above standards to each appellant as set out below.
 
 A. Arocho-Mejias
 
 19
 Arocho-Mejias, one of the pilots, challenges the sufficiency of the evidence with respect to the possession of cocaine with intent to distribute charges.[2] Viera testified without objection that on the day after the cocaine arrived it was retrieved and delivered to, among others, Arocho. This testimony is sufficient to sustain the conviction on the possession count.
 
 B. Baez-Rodriguez
 
 20
 Baez-Rodriguez, the navigator, challenges the sufficiency of the evidence with respect to the conspiracy to import marijuana and cocaine and attempted importation of marijuana charges.[3] As for conspiracy to import marijuana and cocaine in furtherance of the conspiracy, Baez agreed to serve as a pilot, attended planning meetings, evidently furnished the aircraft, and departed with Arocho and Perez on the flight to Colombia to bring back 1,500 pounds of marijuana. That evidence was clearly sufficient to implicate Baez as a conspirator, since the government proved the existence of a conspiracy, Baez' knowledge thereof, and his voluntary participation. United States v. Cardenas-Alvarado, 806 F.2d 566, 569 (5th Cir.1986); see also United States v. Rivera-Santiago, 872 F.2d at 1079.
 
 
 21
 With regard to the attempted importation count, Baez' participation at the planning meetings and on the flight to Colombia satisfied the elements of attempt--an intent to engage in criminal conduct and conduct constituting a substantial step toward the commission of the substantive offense that strongly corroborates the criminal intent. United States v. Dworken, 855 F.2d 12, 17 (1st Cir.1988); United States v. Del Carmen Ramirez, 823 F.2d 1, 2 (1st Cir.1987).
 
 
 22
 Baez, as well as Munoz, suggests that this Court should reject the only testimony that the flight had criminal implications, because it was given by Viera, who was interested in obtaining convictions. Credibility is not an issue for the appellate court. Glasser v. United States, 315 U.S. at 80, 62 S.Ct. at 469; United States v. Garcia Rosa, 876 F.2d at 226. Viera's testimony, even if uncorroborated, was sufficient to sustain the conviction since it was not incredible or insubstantial on its face. United States v. Samalot Perez, 767 F.2d 1, 4 (1st Cir.1985).
 
 C. Perez-Morales
 
 23
 Perez-Morales, who flew to Colombia with Arocho and Baez, obliquely challenges the sufficiency of the evidence with respect to the importation of cocaine count, the possession of cocaine with intent to distribute count and the conspiracy to import cocaine and marijuana count. The evidence against him on the importation count is identical to the evidence against Arocho on the same count. The government conceded, and we agree with its concession, that this evidence was insufficient against Arocho. Since Arocho and Perez were in the same circumstances, we exculpate Perez on the importation count.
 
 
 24
 As to the other two counts, Perez attended planning meetings and departed on the flight to Colombia in attempt to bring back 1500 pounds of marijuana. Furthermore, Viera testified that a portion of other 46 kilos of cocaine delivered on the second plane were distributed to Perez. This evidence is sufficient to sustain his conviction.
 
 D. Miranda
 
 25
 Miranda, one of the women who flew to St. Croix, challenges the sufficiency of the evidence upon which she was convicted of conspiracy to import marijuana and cocaine, importation of marijuana and cocaine and possession of marijuana and cocaine with intent to distribute. Miranda contends that the evidence was insufficient because she did not participate in the first trip and because she did not help plan the other two trips.
 
 
 26
 A conspiratorial agreement may be proven by circumstantial evidence, and the plan may be inferred from a development and collation of circumstances. United States v. Rivera-Santiago, 872 F.2d at 1079. United States v. Hinds, 856 F.2d 438, 443 (1st Cir.1988). Here, the agreement was proven in part by direct evidence of planning meetings and in part by circumstantial evidence of inculpatory conduct. Admittedly, Miranda was not at the core of the conspiracy. She did, however, ally herself with it when she agreed to mask the true purpose of the flights to St. Croix.
 
 
 27
 "[T]he law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). A co-conspirator need not participate in all the objectives of the plan. United States v. Garcia-Rosa, 876 F.2d at 223. When Miranda joined the conspiracy she became responsible for all that transpired beforehand. United States v. Corbin, 734 F.2d 643, 652 (11th Cir.1984); United States v. Saavedra, 684 F.2d 1293, 1301 (9th Cir.1982); United States v. Baines, 812 F.2d 41, 42 (1st Cir.1987).
 
 E. Vivo
 
 28
 Vivo, whose pick-up truck was used in supplying the airplane fuel, challenges the sufficiency of the evidence that sustained his convictions for conspiracy and aiding and abetting the importation ventures. Vivo's dispute is premised upon the testimony adduced on cross-examination of Viera, wherein Viera stated that he was not present when the fuel was purchased, that he did not pay money directly to Vivo, and that Vivo was not present at the airstrip when the airplane arrived. Vivo characterizes the proof of guilt as limited to a single isolated meeting where he was present and was allegedly asked through a third person if his pick-up truck could be used to buy gasoline. Vivo does not dispute the initial proof of his presence at Munoz' home when the initial arrangements were made to obtain gasoline from an airport and deliver it. Even though Viera did not testify that he told Vivo and Munoz that the gasoline would be used to refuel an airplane arriving with contraband, the absence of that testimony was not fatal error.
 
 
 29
 The jury could infer Vivo's knowledge of Viera's purpose from the surrounding circumstances. Firstly, if Viera had had a legitimate purpose for acquiring large amounts of fuel, he would not have needed others to purchase for him. Secondly, Viera went out of his way to ask for the help of someone who was in the position of frequently purchasing large amounts of fuel and was thus less likely to be questioned. Vivo's truck had all the signs on it for an auto parts business that he ran. Thirdly, no legitimate reason has been suggested for Viera's reliance upon him and Munoz to acquire airplane fuel and to deliver it the night the airplane was scheduled to arrive. Fourthly, the fact that the commodity delivered was airplane fuel warranted the inference that Vivo knew that an airplane was landing at a site other than an airport. Fifthly, the large amount of fuel allowed the jury to infer that Vivo knew the airplane had just completed a lengthy journey. Sixthly, Viera testified that the conspirators assembled before proceeding to the airstrip and that Vivo and Munoz brought the gasoline at this time. The cross-examination did not rule out Vivo's participation in the delivery process or Viera's personal observation of him at that time. Seventhly, testimony on cross-examination that Viera did not pay money directly to Vivo for his efforts did not bar the jury from determining that Vivo was present when Viera paid the entire $5,000 to Munoz and that he received his fair share at another time. Finally, there is no testimony contradicting Viera's statement that Vivo as well as Munoz retrieved the empty drums and that fuel was made available for the aircraft not once but twice.
 
 
 30
 This evidence was adequate to prove that Vivo was a conspirator and an aider and abetter in the two successful ventures. A conspiratorial plan and Vivo's connection with it were proved. United States v. Rivera-Santiago, 872 F.2d at 1079. The same proof showed that Vivo took an active role, which made him an aider and abettor in the substantive offenses. United States v. Delgado Figueroa, 832 F.2d 691, 696 (1st Cir.1987). It is the totality of circumstances that inculpates Vivo. "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." Bourjaily v. United States, 483 U.S. 171, 179-80, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987).
 
 F. Aquino
 
 31
 Aquino, who supplied the airstrip in Puerto Rico, argues that conflicts in the government's case exculpate him. None of these conflicts rise to the level of clear error. Furthermore, the duty to resolve any alleged conflicts in testimony rests with the jury. Jackson v. Virginia, 443 U.S. at 319, 99 S.Ct. at 2789. That obligation does not shift to an appellate court. See, e.g., United States v. Alamo, 872 F.2d 202, 207 (7th Cir.1989). The jury in this case knew of its obligation to determine the facts and resolved any conflicts against Aquino.
 
 G. Volmar
 
 32
 Volmar, who introduced Viera to Aquino, contends that at no time did he join or aid and abet the conspiracy. Although Volmar asked for money for the use of his farm for airstrip purposes, his demand was rejected. He then introduced Viera to Aquino and did not participate in any subsequent efforts toward successful completion of the drug importation ventures. The government presents no evidence that he associated himself with the criminal venture beyond these acts. Although Volmar knew that a drug importation scheme was taking place because he was asked to join it, the government presents no evidence that he participated in the venture at all besides the mere introduction of Viera to Aquino.
 
 
 33
 Clearly, this evidence is insufficient to establish guilt.
 
 
 34
 Mere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting. Mere presence at scene of crime is not evidence of guilt. (citations omitted).
 
 
 35
 United States v. Francomano, 554 F.2d 483, 486 (1st Cir.1977) (citing Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949)). An accused must "in some sense promote [the conspiracy] himself, make it his own, have a stake in its outcome." United States v. Falcone, 109 F.2d 579, 581 (2d Cir.1940). Although, a defendant may be guilty of conspiracy without actually profiting financially, see, e.g., United States v. Alemany Rivera, 781 F.2d 229, 237 n. 9 (1st Cir.1985), in the instant case Volmar was indifferent to the outcome altogether. United States v. Noah, 475 F.2d 688, 697 (9th Cir.1973). On such facts we must reverse his convictions.
 
 III. ENGLISH PROFICIENCY
 
 36
 Appellants contend that the indictment was defective because the grand jurors were not proficient in English,[4] that the petit jury also lacked proficiency and that they were entitled to demonstrate that proficiency in English among Puerto Rico residents is on the decline, with a corresponding adverse effect on juries in the District of Puerto Rico.
 
 
 37
 In order to claim the systematic exclusion of Puerto Rico residents from federal grand and petit juries, appellants bear the burden of showing
 
 
 38
 (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 
 
 39
 Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Appellants rely on newspaper accounts claiming a decline in English proficiency among the general population of Puerto Rico. Even if the accounts are accurate, resulting in a smaller pool of eligible jurors and a "systematic exclusion" in the jury selection process, the overwhelming national interest served by the use of English in a United States court justifies conducting proceedings in the District of Puerto Rico in English and requiring jurors to be proficient in that language. United States v. Benmuhar, 658 F.2d 14, 19 (1st Cir.1981).[5]
 
 
 40
 Furthermore, appellants cannot point to any testimony given at the grand jury proceedings indicating that any of the grand jurors was deficient in English. Nor does the transcript of the trial indicate any instance where a juror complained of an inability to follow the proceedings. Moreover, no defense lawyer suggested to the judge that any juror appeared to have problems. Indeed, the selection process was routine with the court posing a number of questions and jurors responding correctly, demonstrating an adequate command of English. News reports are too thin a basis to challenge jury competence.
 
 IV. MISTRIAL
 
 41
 Appellants allege that the denial of a declaration of a mistrial was reversible error. Below, appellants filed motions for mistrial on the ground that three of the jurors had concealed their prior service in a criminal case in which Viera had testified. In addition, the defense faulted the government for not advising the judge of the jurors' prior experience noting that the prosecutors in this case were the same ones who represented the government in the previous case in which Viera had testified.
 
 
 42
 We are reluctant to upset convictions where defendant or counsel failed to make the necessary inquiry during voir dire and objected after testimony started. United States v. Tropeano, 476 F.2d 586 (1st Cir.1973). Jurors cannot be faulted for failing to disclose their previous service since they were never asked during the course of voir dire to make such a disclosure. Moreover, appellants acknowledge that some of the defendants' counsel knew or ought to have known that three jurors had served in previous cases involving Viera. "A sentient defendant, knowledgeable of a possible claim of juror bias, waives the claim if he elects not to raise it promptly." United States v. Uribe, 890 F.2d 554, 560 (1st Cir.1989). It would have been simple to request the court to inquire whether the prospective jurors had sat before.
 
 
 43
 "A defendant seeking a new trial because of nondisclosure by a juror must demonstrate actual prejudice or bias." United States v. Rivera-Sola, 713 F.2d 866, 874 (1st Cir.1983) (citing United States v. Vargas, 606 F.2d 341, 344 (1st Cir.1979)). In this case the matter was dropped as soon as the mistrial was denied. Appellants did not modify their claim for relief, seek an inquiry or even identify the three jurors in question. At no time during the trial did counsel complain that any of the three jurors was acting in a biased manner. The judge instructed the jury to judge the credibility of each witness based upon facts revealed at trial, such as the witness's relationship with the government, his interest in the outcome, his manner of testifying, his opportunity to acquire knowledge concerning the facts testified to and corroboration. The court also told the jury to consider an accomplice's testimony with caution. We presume that the jury heeded these instructions. Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 1706, 95 L.Ed.2d 176 (1987). Mere service on a jury where a witness had appeared previously does not, without more, constitute prejudice sufficient to mandate a mistrial.
 
 EVIDENTIARY RULINGS BELOW
 
 44
 Appellants take issue with the following evidentiary rulings of the district court. We address each of them in turn, keeping in mind that the trial court's rulings on relevance and admissibility are reversible only for an abuse of discretion. United States v. Newton, 891 F.2d 944, 946 (1st Cir.1989).
 
 A. Arocho Post Arrest Statements
 
 45
 Shortly after the trial began appellant Arocho filed a motion to suppress a post-trial statement given by him to law enforcement officers on the ground that it was uttered during plea negotiations. Out of the jury's presence Arocho took the stand and testified that his statement was made during unsuccessful plea negotiations. On cross-examination Arocho stated that at the time of the statement he was brought in from the state penitentiary for a bail hearing while heavily sedated. He stated that his attorney was present and told him to prepare a statement because without one the government would not negotiate with him. Arocho also stated that his attorney was present when he wrote the statement, that the agents told him how to word the statement and that he was told that if no agreement was reached the statement would not be used against him. He testified that he would not have written the statement if his attorney had not told him to. Arocho maintained that the statement was untrue and he denied flying to Colombia to obtain marijuana. Finally, he contended that he was merely on a test flight that had ended with an emergency landing.
 
 
 46
 Following this hearing the district court judge ruled that the statement was admissible. According to the evidence before it, the court found that Arocho was not credible and that there were no plea negotiations proceeding on the date of the statement. The court found that the only negotiations taking place on that day dealt with the amount of the bond that the government intended to recommend to the magistrate. Furthermore, the court found that Arocho's statement was voluntarily made.
 
 
 47
 The trial judge's determination that no plea discussion took place is a finding of fact. Consequently, Arocho has the burden of showing that the finding is clearly erroneous. United States v. Leon Guerrero, 847 F.2d 1363, 1367 (9th Cir.1988). The admissibility question is governed by Fed.R.Evid. 410(4), which forbids a district court from allowing the use in evidence of certain statements associated with the plea bargaining process. Specifically, statements "made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" are prohibited from being used at trial. Fed.R.Evid. 410(4). Arocho's statement was made to government agents, not to an attorney. That alone removes the statement from the purview of Rule 410(4). United States v. Keith, 764 F.2d 263, 266 (5th Cir.1985).
 
 
 48
 Furthermore, the court was well aware of its duty to determine whether the statement qualified for exclusion under Rule 410(4) as well as for lack of voluntariness. Arocho argues that the district court failed to consider the totality of circumstances surrounding the giving of his statement. He points to certain factors such as his own testimony to the effect that he felt compelled by his lawyer's advice to execute the statement, testimony by one of the government agents present that Arocho's attorney was not present when he wrote the statement, and testimony by co-defendant Perez confirming Arocho's claim that he had been given sedatives to treat his extreme nervousness and frequent crying. The testimony of other witnesses was not considered in ruling on the admissibility of the statement because these witnesses took the stand after the ruling was made, and nothing testified to by these government or defense witnesses[6] called into question the propriety of the court's ruling or the jury's determination of voluntariness.[7]
 
 
 49
 Arocho's final argument, made for the first time on appeal, questioning the competency of an attorney who represented him, is best left to collateral attack. See United States v. Mario Nelson Paz Uribe, 891 F.2d 396, 398-99 (1st Cir.1989).
 
 B. Refusal to sever Baez
 
 50
 Baez claims an entitlement to a severance because of his limited participation in the alleged activity and because of the potential spillover effect from Arocho's statement. Baez must make a strong showing of prejudice to demonstrate that the trial court abused its discretion and denied Baez a fair trial. United States v. Cresta, 825 F.2d 538, 554-55 (1st Cir.1987); United States v. Williams, 809 F.2d 75, 88 (1st Cir.1986).
 
 
 51
 The initial joinder was proper because a single conspiracy was charged. The fact that Baez did not participate in every transaction did not entitle him to a separate trial. United States v. Drougas, 748 F.2d at 17. The possibility of spillover was adequately neutralized by the giving of limiting instructions when needed or requested and by the closing directive to give each count and each defendant separate consideration. United States v. Cresta, 825 F.2d at 555; United States v. Moreno Morales, 815 F.2d 725, 742 (1st Cir.1987); United States v. Williams, 809 F.2d at 89; United States v. Rawwad, 807 F.2d 294, 298 (1st Cir.1986).
 
 
 52
 The admission of Arocho's statement did not change the balance that favored a joint trial which included Baez. Arocho's statement never mentioned Baez. Moreover, on two occasions the judge told the jury not to consider the statement against anyone but Arocho. Furthermore, other evidence adduced at trial linked Baez to the same airplane smuggle discussed by Arocho in his statement. See ante at 489. Simply, Baez received a fair trial.[8]
 
 
 53
 C. Exclusion of Documents and Restriction on Cross-Examination
 
 
 54
 Baez disagrees with three of the trial judge's evidentiary rulings. Firstly, he alleges that the trial judge erred by sustaining an objection based on lack of relevance to the introduction of the order issued to detain Arocho pending his bond hearing. Secondly, he contends that the minutes of Arocho's arraignment should have been allowed into evidence. Thirdly, he avers that he was inappropriately denied an opportunity to cross-examine a government agent about these documents. He argues that he had intended to prove that Arocho was scared, depressed and inadequately represented and that he gave the confession after threats of denial of bail.
 
 
 55
 As to the exclusion of the order, the district court did no more than exercise sound discretion in determining relevance. See United States v. Coast of Maine Lobster Co., Inc., 557 F.2d 905, 908 (1st Cir.1977). Although the court did not explain its ruling, presumably because no explanation was requested, it is evident that the agent had nothing to do with causing a detention order to be issued or arraigning Arocho. The documents themselves did not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.
 
 
 56
 Furthermore, the absence of the order had no real effect on the scope of the relevant cross-examination. Arocho's lawyer asked the agent about Arocho's physical condition at the time of his bail hearing before counsel for Baez took his turn at cross-examination. The agent testified that Arocho was in confinement at the time of the statement but that he did not know the length of the confinement. The agent also testified that he was unaware that Arocho had been called "the weeper" at his place of confinement. During cross-examination by counsel for Baez, the court, after sustaining objections to the order that counsel for Baez offered in evidence, overruled an objection to counsel's question whether the agent knew Arocho's bail status at the time of the statement. Thus, the only question that the court disallowed was whether the witness felt that Arocho was affected by his imprisonment.
 
 
 57
 These documents dealt with a matter that the jury did not consider against Baez. The court limited consideration of the statement to the case against Arocho. Moreover, cross-examination of the agent was adequate to allow the jury to discriminatingly appraise the agent's testimony.
 
 D. Hearsay objection
 
 58
 Baez claims as reversible error the admission of a single statement by witness Viera explaining why Baez did not return to Puerto Rico on the flight which brought Arocho and Perez back from Colombia together with 96 kilograms of cocaine. According to Viera, Baez was unable to fit into the airplane because of the weight of the cocaine. The court overruled an objection and rejected Baez' claim that the only way Viera could have known why Baez was not on the flight was if someone told him.
 
 
 59
 A statement by a co-conspirator in the course of and in furtherance of the conspiracy is not inadmissible hearsay. Fed.R.Evid. 801(d)(2). At the time of the third cocaine smuggle Baez was still involved, albeit dormantly. His cessation of activity was not sufficient to constitute a withdrawal. Thus, the information was admissible as the statement of a co-conspirator. Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912). Furthermore, Viera was present when the plane arrived and thus undoubtedly became aware that Baez had not accompanied the plane. He could only have learned the reason for Baez' absence from a co-conspirator. The co-conspirator exception to the rule excluding hearsay justified allowing the jury to hear the testimony. Viera had a continued interest in retrieving the crew of the first flight and even paid for their release. That interest won the trust of the crew, all of whom maintained a united front by concealing from the authorities the true purpose of their flight. Their concealment prevented discovery of the conspiracy. Consequently, a statement made to Viera about Baez' absence from the cocaine-laden plane furthered the conspiracy. See United States v. Tarvers, 833 F.2d 1068, 1077-78 (1st Cir.1987).
 
 
 60
 Lastly, the testimony did not prejudice Baez. It removed him from the scene of the delivery of 96 kilograms of cocaine. For that reason the Government concedes that the evidence was insufficient on the charges against him relating to the importation and distribution of the 96 kilograms. Moreover, the testimony could not have reasonably affected his convictions on the conspiracy or the attempted importation of marijuana counts. Error, if any, was harmless.
 
 
 61
 E. Admitting evidence suppressed by local judge
 
 
 62
 Before the trial, the government informed counsel for Perez that it intended to introduce evidence that Perez possessed cocaine after the 96 kilograms had been imported and informed the court that it intended to offer evidence of the actual cocaine seized to prove possession.[9] At trial, counsel for Perez objected to the admission of the evidence because it had been suppressed by a local judge. The district court told counsel for Perez that it was not bound by the suppression order and scheduled a hearing. Counsel for Perez objected, claiming that the presence of cocaine in the courtroom would be inflammatory and constituted surprise. The district court indicated that the jury would decide whether a sufficient nexus existed between the evidence and what the prosecution intended to prove, and the prosecution advised the court that the defense lawyers had been told of the existence of the cocaine a week before the trial began.
 
 
 63
 At the hearing the district court refused to allow the local judge and prosecutor to testify and relied on the testimony of two local police officers to determine that the officers acted lawfully. The district court declined to suppress the cocaine or other items seized from Perez. At the trial, the government did not use evidence of the seizure of cocaine from Perez. Instead, during the presentation of the principal case an officer testified that he obtained a notebook from Perez and that entries in the notebook linked Perez to the other appellants. Perez contends that the court erred in refusing to agree with the local judge's suppression order and in not allowing the local judge and prosecutor to testify at the suppression hearing. He claims that the court had no reason to reopen the Fourth Amendment issue after a local judge had found illegality warranting suppression of evidence.
 
 
 64
 The local judge's findings were not binding on the district court. The district court acted lawfully in considering the admissibility of evidence question despite the local ruling. United States v. Bonilla Romero, 836 F.2d 39 (1st Cir.1987).
 
 VI. REBUTTAL ARGUMENT
 
 65
 In rebuttal of Aquino's closing argument, the prosecutor noted that a person allegedly also in possession of keys to the airstrip was not called by Aquino as a witness, and asked the jury to wonder why this was so. Although Aquino did not issue a contemporaneous objection, he did request a mistrial and that request was denied. He now argues that his conviction should be reversed because of this remark.
 
 
 66
 A prosecutor ought not to ask a jury to draw adverse inferences from the failure of a defendant to call a witness unless that witness is within the particular control of that party. United States v. Saa, 859 F.2d 1067, 1077 (2d Cir.1988). However, such a comment does not automatically require reversal. See United States v. Newton, 891 F.2d 944 (1st Cir.1989) (citing United States v. Gonzalez-Vargas, 558 F.2d 631, 633 (1st Cir.1977)). If no proper objection is lodged, an examination would probably lead to a determination that the remark was not plain error. United States v. Gipson, 593 F.2d 7 (5th Cir.1979). In fact, the incident at bar was harmless. The witnesses possessing keys that were called, did not rule out Aquino's possession of a key and its late night use in conjunction with smuggling. One witness merely identified other individuals as possessors of a key. Aquino's guilt or innocence was not wholly dependent upon whether the jury believed the key holding witnesses that were called. It is unlikely that the jury could have concluded, based on the evidence, that Aquino was guilty because he failed to call a witness to help his defense. Moreover, the comment was a passing one made in rebuttal. United States v. Young, 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985).
 
 CONCLUSION
 
 67
 We reverse the conviction of appellant Volmar-Figueroa on all counts. We reverse, too, the convictions of appellants Arocho-Mejias and Perez-Morales on Count 7 and the conviction of appellant Baez-Rodriguez on Counts 7 and 8. We affirm the convictions on all other counts and as to all other appellants.
 
 
 
 [1]
 21 U.S.C. Sec. 952 provides in relevant part that "[i]t shall be unlawful to import into the ... United States from any place outside thereof ... any controlled substance ... or any narcotic drug ..."
 
 
 [2]
 The government concedes that it lacks sufficient evidence to convict Arocho on the importation of cocaine count
 
 
 [3]
 The government concedes that it lacks sufficient evidence to convict Baez on the importation of cocaine and the possession of cocaine with intent to distribute counts
 
 
 [4]
 Federal law requires that all grand and petit jurors have the ability to speak English and read, write and understand English with proficiency sufficient to fill out satisfactorily the juror qualification form. 28 U.S.C. Sec. 1865(b)(2) & (3)
 
 
 [5]
 In Benmuhar, the appellant complained that the requirement of English proficiency caused a systematic exclusion of a substantial portion of the Puerto Rican population from federal juries. We acknowledged this exclusion, but held that the requirement was constitutional because it served a significant state interest
 
 
 [6]
 The testimony of the prison doctor who stated that he administered no medication to Arocho but suspected that someone might have done so is not enough to reverse the determination of voluntariness
 
 
 [7]
 Munoz argues that the district court should not have allowed Arocho's statement into evidence after ruling that Arocho was not a credible witness. That argument confuses two separate points. The court did not rule on the accuracy of the contents of the statement. Simply, it held that the statement was voluntarily given. The court found Arocho unworthy of belief to challenge the voluntariness of his statement. The finding that Arocho was not credible did not prevent his out of court statement from being admitted into evidence
 
 
 [8]
 Baez was convicted on Counts 7 and 8 (importation of cocaine and possession of cocaine with intent to distribute) on evidence that the government concedes was insufficient. Because these convictions are some evidence that the jury did not observe all limiting instructions, Baez' claim that the failure to follow limiting instructions also affected the verdict on Counts 1 and 2 (conspiracy and attempted importation of marijuana) has more force than in the usual case. We think, however, that the evidence linking him to the attempted importation and the conspiracy was strong. After reviewing the entire record, we do not think that this is one of those "extremely rare" circumstances, United States v. Scivola, 766 F.2d 37, 41 (1st Cir.1985), where the defendant has made a showing of prejudice strong enough to find that the district court abused its discretion by refusing to grant Baez' motion for severance
 
 
 [9]
 Perez also points to excerpts from the cross-examination of Viera claiming that they represent instances of vouching by the trial judge in favor of the witness. Because no objection was made at trial, we consider this claim under the plain error doctrine. United States v. Mario Nelson Paz Uribe, 891 F.2d 396 (1st Cir.1989). Merely sustaining objections, admonishing individuals in the courtroom not to laugh or grimace at testimony, or commenting that a writing was uncertain, does not indicate vouching. These incidents do not constitute plain error and fall within the proper role of a judge as "governor of the trial for the purposes of assuring its proper conduct and of determining questions of law." Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933)