February 11, 1993
 United States Court of Appeals
 For the First Circuit
 

No. 92-1737

 UNITED STATES,

 Appellee,

 v.

 JOSEPH S. BENEVIDES,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ernest C. Torres, U.S. District Judge]
 

 

 Before

 Selya, Circuit Judge,
 
 Bownes, Senior Circuit Judge, and
 
 Stahl, Circuit Judge.
 

 

Randy Olen with whom John M. Cicilline was on brief for
 
appellant.

Margaret E. Curran, Assistant United States Attorney, with whom
 
Lawrence D. Gaynor, Assistant United States Attorney and Lincoln C.
 
Almond, United States Attorney, were on brief for appellee.
 

 

 February 11, 1993
 

 STAHL, Circuit Judge. At his jury trial, defendant
 

Joseph S. Benevides was convicted of conspiracy to transfer a

firearm illegally. On appeal, defendant challenges the

sufficiency of the evidence supporting his conviction.

Finding sufficient evidence to sustain the conviction, we

affirm.

 I.
 

 BACKGROUND
 

 We summarize the evidence in a light most favorable

to the government. United States v. Nueva, 979 F.2d 880, 881
 

(1st Cir. 1992). Defendant was employed at Handy and Harmon

Jewelry Company ("Handy and Harmon") in East Providence,

Rhode Island. On May 15, 1991, Officer Genaro Ramirez of the

East Providence Police Department began undercover work as an

employee of Handy and Harmon. Although his original

assignment was to investigate complaints of gold theft from

the company, Ramirez began investigating other possible

criminal activity as well. As part of his investigation,

Ramirez told Yee Yang, another employee of Handy and Harmon,

that he was interested in purchasing a gun for his own

protection. Soon thereafter, defendant approached Ramirez at

work and told him that he had a friend who could supply

Ramirez with guns. Defendant mentioned specifically that his

friend had a "beautiful" sawed-off shotgun that defendant

himself had consideredpurchasing. Ramirezexpressed interest.

 -2-
 2

 On June 27, 1991, defendant advised Ramirez that he

had made arrangements for Ramirez to meet his friend after

work. Ramirez was reluctant to meet defendant's friend that

day because he had advised neither his supervisors nor

federal officers from the Bureau of Alcohol, Tobacco and

Firearms of the meeting. Defendant was very persistent,

however, and for the sake of the investigation, Ramirez felt

he had no choice but to go. Defendant and Ramirez drove in

separate cars to a liquor store parking lot where defendant

had arranged to meet his friend, Hans Lunder ("Smitty"). 

 Smitty, accompanied by his wife, arrived at the

parking lot in a black van. Defendant introduced Ramirez to

Smitty and his wife. After introductions, defendant asked

"Why don't you guys get to business[?]" In the presence of

defendant, Ramirez told Smitty that he had no money with him,

but that he was interested in purchasing the sawed-off

shotgun. In the course of the conversation, defendant asked

Smitty if Smitty had the shotgun with him. Smitty replied

that he did. Smitty mentioned that he could also provide

Ramirez with a .357 handgun, although he did not have it with

him. 

 Ramirez then asked to see the shotgun. Smitty

disappeared momentarily and returned. With defendant still

present, Smitty told Ramirez to proceed to a white car that

was parked about twenty-five feet away in the parking lot, to

 -3-
 3

get into the passenger side, and to "make it look cool

because of the cops." 

 Ramirez proceeded to the car alone, leaving

defendant with Smitty and his wife. Upon getting in the car,

Ramirez met William Dawson. Dawson showed Ramirez a sawed-

off shotgun, and assured him that it functioned. Dawson and

Ramirez agreed on a price of $200 for the gun. Ramirez told

Dawson that he had no money, but that when he was ready to

purchase the gun, he would let Dawson know through defendant.

 Ramirez then returned without the gun to Smitty's

van. With defendant still present, Ramirez told Smitty that

he would let Smitty know, through defendant, when he had

enough money to buy the sawed-off shotgun. 

 Less than one month later, on July 22, 1991,

defendant approached Ramirez and asked him if he was still

interested in buying the sawed-off shotgun or the .357

handgun that Smitty had mentioned. When Ramirez replied in

the affirmative, defendant said that he would make the

necessary arrangements for the purchases by telephoning

Smitty. 

 Two days later, on July 24, defendant approached

Ramirez at work and told him that the deal had been set for

the following day. The next day, July 25, defendant advised

Ramirez that the deal was set for later that day, but that

 -4-
 4

defendant would have to contact Smitty to make sure of the

time and place of the meeting. That afternoon, defendant

approached Ramirez to tell him that he had spoken with Smitty

and that Smitty had arranged a meeting for that afternoon at

the same liquor store parking lot where the parties had

previously met. Defendant stated that he would not be

present because he had to buy parts for his truck. Defendant

said that Smitty would not be present either, but that Dawson

would arrive with both the shotgun and the .357 handgun. 

 Ramirez arrived alone at the parking lot at the

appointed time and found Dawson standing outside of a

minivan. Dawson told Ramirez that he had the sawed-off

shotgun which Ramirez had previously seen, and that another

person, located across the street from where Dawson and

Ramirez were standing, had the .357 handgun which Ramirez

could purchase. 

 Ramirez began haggling with Dawson about the price

of the shotgun. Dawson said that he could go no lower than

$170 because Smitty was getting $50 of the purchase price.

When asked whether defendant was receiving any portion of the

money, Dawson replied that he was not. Ramirez purchased the

gun from Dawson for $170. 

 After placing the shotgun in the trunk of his car,

Ramirez returned to Dawson's minivan and inquired about the

.357 handgun. Dawson directed Ramirez across the street,

 -5-
 5

where Ramirez met a man named "Bill" who showed him the .357

handgun. Ramirez and Bill negotiated a price of $450 for the

.357 handgun. Subsequently, Bill departed the scene, and

though Ramirez expected his return, Bill never reappeared.

Ramirez left without purchasing the handgun. 

 The following day at work, defendant asked Ramirez

if he had purchased a gun, and Ramirez replied that he had

purchased the shotgun. Five days later, on July 31, Ramirez

told defendant that he had sold the shotgun for a profit. On

August 1, Ramirez told defendant he was still interested in

the .357 handgun. From a telephone at work, defendant called

Smitty, and handed the phone to Ramirez. Smitty apologized

to Ramirez for the disappearance of Bill, and asked if

Ramirez was satisfied with his purchase of the shotgun. 

 On August 9, 1991, defendant again called Smitty

from work, and again handed the phone to Ramirez. Ramirez

asked about the .357 handgun, and Smitty told him that Bill

had gone to Florida, and that he could not get the handgun

until a later date. That day, defendant gave Smitty's phone

number to Ramirez.

 On October 17, 1991, defendant was arrested. The

indictment against defendant charged him with conspiracy to

transfer a firearm in violation of 26 U.S.C. 5861(e)1,

 

1. 26 U.S.C. 5861(e) makes it unlawful for any person to
"transfer a firearm in violation of the provisions of this
chapter."

 -6-
 6

58112, and 5812(a)3 of the National Firearms Act ("the

Act"), all in violation of 18 U.S.C. 371.4

 

2. 26 U.S.C. 5811 provides in relevant part:

 (a) Rate. There shall be levied, collected, and
 Rate.
 paid on firearms transferred a tax at the rate of
 $200 for each firearm transferred . . . .

 (b) By whom paid. The tax imposed by subsection
 By whom paid.
 (a) of this section shall be paid by the
 transferor.

3. 26 U.S.C. 5812(a) provides:

 A firearm shall not be transferred unless (1) the
 transferor of the firearm has filed with the
 Secretary [of the Treasury] a written application,
 in duplicate, for the transfer and registration of
 the firearm to the transferee on the application
 form prescribed by the Secretary; (2) any tax
 payable on the transfer is paid as evidenced by the
 proper stamp affixed to the original application
 form; (3) the transferee is identified in the
 application form in such manner as the Secretary
 may by regulations prescribe, except that, if such
 person is an individual, the identification must
 include his fingerprints and his photograph; (4)
 the transferor of the firearm is identified in the
 application form in such manner as the Secretary
 may by regulations prescribe; (5) the firearm is
 identified in the application form in such manner
 as the Secretary may by regulations prescribe; and
 (6) the application form shows that the Secretary
 has approved the transfer and the registration of
 the firearm to the transferee. Applications shall
 be denied if the transfer, receipt, or possession
 of the firearm would place the transferee in
 violation of the law.

4. 18 U.S.C. 371 provides in relevant part:

 If two or more persons conspire either to commit
 any offense against the United States, or to
 defraud the United States, or any agency thereof in
 any manner or for any purpose, and one or more of
 such persons do any act to effect the object of the
 conspiracy, each shall be fined not more than

 -7-
 7

 At trial, the government's evidence showed that the

gun which Ramirez purchased from Dawson was a firearm within

the meaning of 26 U.S.C. 5845(a)(2),5 that it was

unregistered, and that it was transferred without the

required application to transfer and without payment of the

required transfer tax.

 II.
 

 DISCUSSION
 

 Defendant challenges the sufficiency of the

evidence supporting his conviction. More specifically,

defendant argues (1) that there was insufficient evidence

that he entered into an agreement to commit the unlawful

 

 $10,000 or imprisoned not more than five years, or
 both.

5. 26 U.S.C. 5845(a)(2) provides:

 The term "firearm" means a weapon made from a
 shotgun if such weapon as modified has an overall
 length of less than 26 inches or a barrel or
 barrels of less than 18 inches in length.

The weapon which was transferred was a modified shotgun with
an overall length of twenty one and one-half inches, and a
barrel length of twelve and one-half inches. 

 -8-
 8

act,6 and (2) that he was indifferent to the outcome of the

conspiracy. 

 In reviewing a claim of insufficient evidence, we

view the evidence in the light most favorable to the verdict,

and determine whether a rational trier of fact could have

found guilt beyond a reasonable doubt. United States v.
 

Tejeda, 974 F.2d 210, 212 (1st Cir. 1992).
 

 "The `essence' of conspiracy is an agreement to
 

commit a crime." United States v. Moran, No. 91-1772, slip
 

op. at 3 (1st Cir. Jan. 20, 1993) (emphasis in original).

Thus, a sustainable conspiracy conviction requires "proof

beyond a reasonable doubt that the conspirators intended to

agree and to commit whatever substantive criminal offense may

have been the object of their unlawful agreement." United
 

States v. Cruz, No. 91-1047, slip op. at 7 (1st Cir. Dec. 18,
 

1992). The unlawful agreement may be either express or

tacit. Tejeda, 974 F.2d at 212. Its existence may be proven
 

 

6. In that part of his brief which argues that there was
insufficient evidence of an agreement, defendant also asserts
that the government's evidence failed to show that he "had
the necessary intent to commit the substantive offense." To
the extent that this statement is an attempt to raise an
issue other than the sufficiency of the evidence, it is
plainly inadequate to warrant our review. We have repeatedly
warned parties that "issues adverted to in a perfunctory
manner, unaccompanied by some effort at developed
argumentation, are deemed waived." United States v. Zannino,
 
895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082
 
(1990). Accordingly, we decline to engage in speculation or
to forge beyond the line of argument that defendant has
explicitly pursued in his appeal. 

 -9-
 9

by direct or circumstantial evidence. Id. Moreover, the
 

government is not required to prove that the defendant knew

about, or took part in, all aspects of the conspiracy. Cruz,
 

slip op. at 8; United States v. Rivera-Santiago, 872 F.2d
 

1073, 1079 (1st Cir.), cert. denied, 492 U.S. 910, 493 U.S.
 

832 (1989). All that is required is that the government show

"`the essential nature of the plan and the [defendant's]

connection with it.'" Id. (quoting Blumenthal v. United
 

States, 332 U.S. 539, 557 (1947)). The record before us
 

discloses ample evidence to support defendant's conviction of

conspiring to transfer a firearm illegally.

 The government's evidence showed that defendant

approached Ramirez and told him about a friend who could

supply guns, that defendant arranged the first meeting in the

parking lot, that he persisted in bringing Ramirez to the

first meeting, that he arrived at the first meeting and asked

Smitty whether Smitty had brought the shotgun, that he

remained in the parking lot with Smitty throughout the first

meeting, that he approached Ramirez about the second meeting,

that he arranged the second meeting when the gun was

transferred, and that he continued to phone Smitty after the

transfer. In our view, such evidence is more than sufficient

for a reasonable jury to have inferred an agreement between

 -10-
 10

Smitty and defendant to transfer the gun to Ramirez.7

Accordingly, we find defendant's sufficiency argument

unpersuasive.

 

7. In his motion to the district court for judgment of
acquittal, and again on appeal, defendant has relied on
United States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985), to
 
argue that he merely helped a willing buyer locate a willing
seller. As the district court properly noted in denying
defendant's motion, however, Tyler differs significantly from
 
the case before us. 
 In Tyler, the defendant met an undercover police officer
 
who expressed an interest in purchasing drugs. Defendant
Tyler then approached drug dealers in the street on behalf of
the officer. Eschewing the first dealer he met, Tyler
arranged for the officer to purchase heroin from a second
dealer. There was no evidence that Tyler knew either seller.
Finding that "[t]he evidence adduced by the government merely
shows that Tyler helped a willing buyer locate a willing
seller," id. at 69, the Second Circuit reversed Tyler's
 
conspiracy conviction, reasoning that "such evidence,
standing alone, is insufficient to establish the existence of
 
an agreement between [Tyler] and the seller." Id. (emphasis
 
supplied). 
 In the instant case, the government's evidence shows
that defendant approached Ramirez at work on several
occasions regarding the transfer, that he placed several
phone calls, arranged two meetings, and attended the first
meeting. Therefore, unlike the spontaneous sale in Tyler,
 
which provided no evidence of an agreement between Tyler and
the seller, the record before us presents ample evidence from
which the jury could have found an agreement between
defendant and Smitty to transfer the shotgun.
 Defendant further argues that the district court, in
reaching its decision that Tyler did not apply, unduly relied
 
on the government's assertion that defendant "initiated"
discussions about the gun. Our review of the record,
however, shows that the district court did not limit itself
to evidence regarding the initiation of the sale. Instead,
the district court properly considered all of the evidence of
an agreement, including defendant's phone calls, his
arrangement of the meetings and his later conversations with
Ramirez about the transfer, when it denied defendant's motion
for judgment of acquittal based on Tyler.
 

 -11-
 11

 Defendant's second argument suffers a similar fate.

A conspiracy conviction will not be sustained if the

government's evidence shows that a defendant "was indifferent

to the [conspiracy's] outcome altogether." United States v.
 

Aponte-Suarez, 905 F.2d 483, 491 (1st Cir. 1990), cert.
 

denied, 111 S. Ct. 531 (1990), 111 S. Ct. 975 (1991).
 

Instead, "[a]n accused must `in some sense promote [the

conspiracy] himself, make it his own, have a stake in its

outcome.'" Id. (quoting United States v. Falcone, 109 F.2d
 

579, 581 (2d Cir.), aff'd, 311 U.S. 205 (1940)). In the case
 

at bar, there was evidence that defendant approached Ramirez

on numerous occasions, planned meetings, persisted in

bringing them about, and asked about the transfer after it

occurred. Far from showing indifference, this evidence tends

to indicate that defendant actively promoted the transfer

which underlies his conviction. Accordingly, we reject

defendant's contention that a reasonable jury only could have

found that he was indifferent to the outcome of the

conspiracy.8 

 

8. In arguing that he was indifferent to the conspiracy's
outcome, defendant relies almost exclusively on the fact that
he received no money for the transfer. However, a defendant
"may be guilty of participation in a criminal conspiracy
without actually profiting from or having any financial stake
in it." United States v. Alemany Rivera, 781 F.2d 229, 237
 
n.9 (1st Cir. 1985), cert. denied, 475 U.S. 1086 (1986). See
 
also Aponte-Suarez, 905 F.2d at 491. Simply put, in the face
 
of the aforementioned evidence, we do not find defendant's
lack of a financial stake in the sale of the shotgun to be a
sufficient basis for overturning the jury's verdict.

 -12-
 12

 III.
 

 CONCLUSION
 

 For the foregoing reasons, defendant's conviction

is affirmed. Affirmed.
 

 -13-
 13